THE PEOPLE ex rel. HENRY A. FURMAN et al., Respondents, *v.* HARRISON CLUTE, Appellant.

An act was passed by the legislature in 1853 (chap. 80, Laws of 1853) purporting to amend "section 22 of chapter 20 of title 1 of the first part of the Revised Statutes, fourth edition." The provision incorporated and thus designated in the compilation of statutes referred to was not a part of the Revised Statutes, but was a statutory enactment existing prior to the revision and not repealed thereby. (Chap. 352, Laws of 1829.) *Held*, that the intent of the legislature was to amend that portion of the statute law which was to be found in printed form in the compilation referred to, and the act was effectual to make such amendment.

By the provision of the charter of the city of Schenectady, which enacts that supervisors of wards elected thereunder shall be subject to all the provisions applicable to supervisors in the towns (§ 8, chap. 385, Laws of 1862), a supervisor of a ward of that city is brought within the prohibition of the statute declaring that no supervisor of any town shall be elected or appointed to hold the office of superintendent of the poor. (Chap. 80, Laws of 1853.) By this prohibition a supervisor is not merely made ineligible to hold the office of superintendent, but he is ineligible to an election or appointment thereto.

This statutory provision does not infringe upon the constitutional rights of an elector to vote for all elective officers (§ 1, art. 2, State Constitution), nor upon his right to be elected to any office.

Where the power is reserved to the legislature to direct the method of filling an office, whether by election or appointment, it may in its discre-

tion, when conferring upon the elector the power to elect, limit the number from whom he may select, or declare one holding another office ineligible to receive his suffrage.

*It seems* the same legislative power exists in reference to offices created or continued by the Constitution, and thereby made elective. ·

A minority of the whole body of qualified electors may elect to an office where the majority decline to vote, or where they vote for one who is ineligible to the office, knowing of the disqualification. Notice of the disqualifying fact, and of its legal effect, may be given so directly to the voter as to charge him with actual knowledge of the disqualification; or the disqualifying fact may be so patent or notorious as that his knowledge of the ineligibility may be presumed as matter of law. But not only the fact which disqualifies, but also the rule or enactment of law which makes it thus effectual, must be brought home so clearly to the knowledge or notice of the elector as that to give his vote therewith indicates an intent to waste it in order to render his vote a nullity.

Where a majority of the electors, through ignorance of the law or the fact, vote for one ineligible to the office, the votes are not nullities; but while they fail to elect, the office cannot be given to the qualified person having the next highest number of votes. The election is a failure, and a new election must be had. (The rule stated which should govern in such case.)

Precedents drawn from the action of legislative committees are not satis-factory. (Per Folger, J.)

(Argued December 2, 1872; decided December 10, 1872.)

Appeal from judgment of the General Term of the Supreme Court in the third judicial department, affirming in part and reversing in part a judgment entered upon the decision of the court upon trial at Special Term. (Reported below, 42 How. Pr., 157.)

This action was brought to oust defendant from the office of superintendent of the poor of the county of Schenectady and to put relator in possession.

At a city election held in April, 1871, said Clute was duly elected supervisor of the fifth ward, accepted the office, and discharged its duties until the 12th day of December, 1871, when he resigned.

At the general election in 1871 the office of superintendent of the poor was to be filled by the electors of the county of Schenectady. The relator, Furman, and the defendant, Clute, were both candidates for said office, and were voted for by the

electors.   The whole number of votes was 4,676, of which Clute received 2,448 votes and Furman 2,228.   Of the votes given for Clute, 295 were given in the fifth ward of the city of Schenectady, which then constituted one election district. Clute was declared elected, and having filed his official bond and taken the oath of office, he on the first day of January, 1872, entered into said office and still continues therein.

Previous to January 1, 1872, the said Furman took the oath of office and tendered and deposited with the county clerk a bond in due form and sufficiency as superintendent of the poor of said county, and claimed the said office.

There was no proof of actual notice of Clute's ineligibility to any of the electors of said county, nor proof of any facts from which notice could be implied other than his holding the office of supervisor of the fifth ward.

The Special Term decided that defendant was disqualified from holding the office; that his election was void, and conferred upon him no title to the office; that there being no proof of notice to the electors of such disqualification nor of facts from which knowledge or notice could be presumed, neither of the candidates acquired title to the office, and the election was a failure.   It thereupon ordered judgment ousting the defendant from the office without costs to either party.   Judgment was entered accordingly.   The General Term affirmed the judgment so far as that defendant be ousted from the office, but reversed it so far as it adjudged that the relator was not entitled to the office, and directed judgment that he is so entitled, and gave him his costs.

*J. S. Landon* for the appellant.   Chapter 80, Laws of 1853, is unconstitutional.   (*Barney* v. *McCreary*, 1 Cong. Elec. Cases, 167; *Turney* v. *Marshall*, 2 id., 167; *Trumbull's Case*, 2 id., 618; *Green* v. *Shumway*, 39 N. Y., 418; *McCaffray* v. *Guyer*, 59 Penn., 109; *Page* v. *Allen*, 58 id., 338; *State* v. *Adams*, 2 Stew. [Ala.], 239; *Barto* v. *Himrod*, 8 N. Y., 483; *Sturgis* v. *Spofford*, 45 id., 446, 450; *People* v. *Draper*, 15 id., 543; *Barker* v. *People*, 3 Cow., 686.)   Defendant

was not ineligible ; he was not a supervisor of a town, but of a ward of a city. (1 Black. Com., side p. 92 ; *Chase* v. *N. Y. C. R. R.*, 26 N. Y., 523 ; Potter's Dwarris, 245, note, id., 251, 255 ; *Hebbard* v. *Johnson*, 3 Taunt., 177.) If defendant was ineligible, the relator cannot claim to be elected. (*Wyne-hammer* v. *People*, 13 N. Y., 378, 392 ; *Rockwell* v. *Nearing*, 35 id., 302 ; *State* v. *Anderson*, Coxe, 318 ; *Commonwealth* v. *Cluley*, 56 Penn., 270 ; *Saunders* v. *Haynes*, 13 Cal., 145 ; *State* v. *Giles*, 1 Chand. [Wis.], 112 ; *State* v. *Smith*, 14 Wis., 497 ; 38 Me., 597 ; *Regina* v. *Hiorns*, 7 Ad. & Ell., 960 ; 34 Eng. Com. Law, 496 ; Angel & Ames on Corp., § 131 ; *Rex* v. *Bridge*, 1 Maule & Sel., 76 ; *Rex* v. *Hawkins*, 2 Dow. H. L. R., 124.) Defendant's resignation of the office of supervisor qualified him to hold that of superintendent. (*Rex* v *Trelawney*, 3 Burrows, 1615 ; *Milward* v. *Thatcher*, 2 Durn. & East., 87.)

*E. W. Paige* for the respondents. Furman was legally elected superintendent of the poor, and is entitled to the office. (State Const., art. 1, § 17 ; *Gostling* v. *Veley*, 7 Q. B., 437 ; Wilson's Dig. Parl. Law, 107, 114 ; *Gulick* v. *New*, 14 Ind., 97 ; *Carson* v. *McPhetridge*, 15 id., 331 ; *Hatcheson* v. *Tilden*, 4 Har. & McH., 279 ; *Commonwelth* v. *Read*, 2 Ashmead, 261 ; *Same* v. *Green*, 4 Whart., 521, 580, 581 ; *Same* v. *Cluley*, 56 Penn. St., 270.) That Clute was dis-qualified was known to the electors of the fifth ward from the evident notoriety of the fact. (Grant on Corp., 208 ; Male on Elections, 111 ; Heywood on County Elections, 359–361 : Roe on Elections, 278, ed. 1818 ; Clerk on Elections, 173, 174 ; Chambers' Dict. of Election Laws, title "Disquali-fication," 3 ; Lester's Law of Elections, 11 ; Orme's Law of Elections, 133 ; Stephen's Law of Elections, vol. 1, p. 359 ; Warren's Prac. of Elec. Com., 557 ; Warren on Parl. and Elec. Law, 231 ; *Carson* v. *McPhetridge*, 15 Ind., 331 ; *Gulick* v. *New*, 14 id., 100 ; *Stewart* v. *Hayes*, 3 Chi. Leg. News, 117 ; *Reg.* v. *Mayor of Tewksbury*, L. R., 3 Q. B., 629 ; *Holman* v. *Burrow*, 2 Ld. Raymond ; 1 Greenl. Ev., § 6 ;

*Cooper* v. *Phibbs L. R.*, 2 H. L., 170; *Holmes* v. *Remsen*, 4 J. C. R., 487; Broom's Legal Maxims, 201; *Galway Election Case*, 2 Moak's Eng. R., 726; 2 Shoub., 300; 1 Mod., 87–300; ·Grant on Corp., 208.)    Chapter 80, Laws of 1853, is constitutional and valid.    (*Wynehamer* v. *People*, 3 Kern., 392–395; *People* v. *Quant*, 2 Park. Cr. R., 414, and note, 687; *People* v. *Draper*, 15 N. Y., 544, per Denio, J.; *Newell* v. *The People*, 3 Seld., 109; *Fletcher* v. *Peck*, 6 Cranch, 128; *Ex parte McCollam*, 1 Cow., 560; *Clarke* v. *Rochester*, 5 Abb. Pr., 107; 24 Barb., 446; *McCool* v. *Smith*, 1 Black., 469; *Wood* v. *U. S.*, 16 Pet., 342; 10 Barr, 448; *Hartford* v. *U. S.*, 8 Cranch, 109; *Brown* v. *County Com.*, 21 Penn., 37; *Street* v. *Commonwealth*, 6 W. & S., 209; *Bowen* v. *Lease*, 5 Hill, 221; *Williams* v. *Potter*, 2 Barb., 316; *People* v. *Denning*, 1 Hill, 271.)

Folger, J.    The first question to be considered on this appeal is whether Clute was eligible to the office of superintendent of the poor.

It was enacted by chap. 352 of the Laws of 1829 (Laws of 1828 and 1829, p. 538) that no supervisor of any town should be appointed to hold the office of superintendent of the poor in any county.

In the compilation of statutes, commonly known as the "Revised Statutes, fourth edition," the text of this act of 1829 is incorporated as "* § 22 of title 1, chap. XX, part 1, of the Revised Statutes."

In 1853 it was enacted (Laws of 1853, chap. 80, p. 115) as follows: "§ 1. Section twenty-two, of chapter twenty, of title one, of the first part of the Revised Statutes, fourth edition, is hereby amended so as to read as follows: § 22. No supervisor of any town    *    *    *    shall be elected or appointed to hold the office of superintendent of the poor    *    *    *    in any county    *    *    *    ." .

In 1862, the legislature amended the charter of the city of Schenectady (Laws of 1862, chap. 385, pp. 644–661, § 8), and enacted that the supervisors of wards to be elected thereunder

should be subject to all the provisions of law then applicable to those officers in the towns of the State.

As Clute, in April, 1871, was elected a supervisor of the fifth ward in the city of Schenectady, and held the office at the general election in that year, he is affected by these several statutes, unless for the reasons urged in his behalf they do not apply to him.

1st. It is claimed that the act of 1853 did not amend the Revised Statutes, for the reason that there existed no such Revised Statutes as was therein referred to. It is true that the act of 1829 was not, on the revision of the statute law, made a part of the Revised Statutes. And it is equally true that the legislature, by the terms of the act of 1853, did not explicitly profess to amend the act of 1829. And it is equally true that what is called the fourth edition of the Revised Statutes is not immediately the work of the legislature, but is a compilation of private persons.

But if the words "fourth edition" are rejected from the act of 1853, then it is in terms a legislative enactment for the amendment of section twenty-two of chapter twenty, title one, of the first part of the Revised Statutes.

There is a section of the Revised Statutes to which these descriptive words exactly fit. It is in title one, chapter twenty, of the first part. Its subject-matter is of the poor, and is thus of kin with the act of 1853.

We may not say, if the words "fourth edition" be rejected, that the legislature did not intend to substitute the provision in this act of 1853 for that of section twenty-two as it stands in the Revised Statutes; and in that case the substitute would be law. But it is better to consider and apply all the words used in the enactment of 1853, and give them all force as expressive of intention.

And then, as judges or as lawyers or as legislators, we know that there is a compilation of statute law, known as the fourth edition of the Revised Statutes; that it stands in the libarries; is cited upon briefs of counsel and in the opinions of judges; has State official recognition by the certificate to it of

the secretary of state; has the legislative permission of its publication so far as it reprints the Revised Statutes; and by like authority may be read in evidence.

It would be idle, then, to say that when the appellation "the Revised Statutes, fourth edition" is used in a law or elsewhere, it does not carry the mind of legislator or judge or of counsel to this compilation. It is not, then, difficult to determine what was the intention of the legislature in passing the act of 1853. It was to amend that portion of statute law which was to be found in printed form in the compilation referred to, there to first seeming set forth as section twenty-two of title one, chapter twenty of part first of the Revised Statutes. Nor is it difficult to say that such intention had effect, for the statute law there set forth in printed form is, by amendment, changed to read as runs the later enactment.

We do not, in thus holding, sanction, in the sense of giving approbation to, such a manner of legislation. It is our duty to learn, from the words which the legislature has used, its purpose. And however loose and careless may be the legislative work, if the legislative intention is made manifest, that we must uphold, unless weightier objection exists.

2d. It is claimed that Clute was supervisor of a *ward* in the city, and not of a town.

But the charter of the city, in the provision above referred to, made the supervisors of the wards thereof subject to all the provisions of law in the performance of those duties. But the charter had already said that they should perform all the duties of supervisors of towns. It needed not, for the purpose of confining them in the performance thereof to the same limits as fixed for supervisors of towns, to add the clause we are considering. It is obvious that its purpose was apart from the definition of duty, or prescription of mode of performance of it. It is not a clause of giving. It is one of restriction, of subjection, and put about Clute, as a supervisor of the fifth ward of Schenectady, all the limits which any then existing law placed around a supervisor of a town.

3d. It is claimed by the learned counsel for Clute, and certainly ingeniously argued, that the act of 1853 is unconstitutional. 1st. For that it impairs the right of suffrage, because it restricts the right of the elector to select and vote for a candidate from the whole body of electors. It is true that the privilege of suffrage is conferred, and the right to exercise it is guaranteed by the Constitution. Every elector shall be entitled to vote for all officers that now are or hereafter may be elective by the people. (Const., art 2, § 1.) And there is no provision of the Constitution which expressly empowers a limitation thereof, save those which authorize laws of exclusion of persons convicted of bribery, larceny or any infamous crime, etc. (art. 2, § 2), and laws for ascertaining by proper proofs the citizens who shall be entitled to the "right of suffrage." (Art. 1, § 4.)

It is argued that " the constitutional right to vote " is unconstitutionally interfered with, if the legislature may restrict and hedge it about by denying to the elector entire freedom in the choice of his candidate.

It is not necessary in this case to determine whether the position of counsel is well taken, so far as an office created or continued by the Constitution, and thereby made elective, is concerned; though there are authorities which tend to show that, as a general principle, it is not. (See *The People* v. *Fisher*, 24 Wend., 215; *The People* v. *Snedaker*, 14 N. Y., 52; *Ex parte McCollum*, 1 Cow., 550.)

In *Barker* v. *The People* (3 Cowen, 686) it is expressly decided that the legislature may affix ineligibility to office as a punishment for crime and not encroach upon the constitutional privilege of the elector. This was placed upon the ground that it is a part of the legislative or sovereign power of the State to maintain social order, and to take life, liberty and all the rights of both when the sacrifice is necessary. For the common weal, the right of the criminal to receive the suffrage of the elector, and the right of the elector to give his suffrage to the criminal, may be taken away. And as social order may be preserved by the threatening of punishment for its

infraction, so it may be preserved by preventive laws, rendering its infraction impossible. Thus in the case in hand, it was perceived that it was incompatible, for an officer, who as superintendent of the poor was the temporary custodian and the almoner of the public moneys, to sit as supervisor in audit of his own accounts, and so for the prevention of the disorders which might arise from this incompatibility if permitted to exist, it was within the legislative or sovereign power to guard against it by a limit, in the special case, upon the right to receive and the right to give a vote for the former office. Will not the same principle sustain the right to the exercise of the same power in any similar and fitting case, whatever the office may be?

But we are not here called upon to go so far.

The office of superintendent of the poor is of statutory origin (see Laws of 1822–3–4, p. 383; 1 R. S., p. 616, § 15), and was originally filled by appointment. It was not until 1847, and of course after the adoption of the Constitution, that the legislature made it an elective office (Laws of 1847, chap. 498, p. 740), so that there is no right bestowed by the Constitution upon the elector to choose by vote to that office. But there is a gift from the legislature to the elector so to do, or rather a power thereto intrusted to him by statute, which may be taken back again. Now, the authority which confers a power, and may take it away, may, in bestowing it, limit and restrict its exercise as it sees fit, so far as it is not specially prohibited therefrom; and may within that limit say for how long, in what manner and upon what objects it shall be exerted. Certainly, if the legislature may say to the voter, you shall not vote for any one for this office, but it shall be appointive; it may say you shall not vote for any one for this office who is not free from this disqualification which we now declare. And the power is reserved to the legislature to direct, whether by election or appointment shall be made the choice of all county officers, the mode of the choice of whom is not provided for by the Constitution. (Const., art. 10, § 2.) The legislature may not put upon any elector a per-

460. THE PEOPLE ex rel. FURMAN et al. *v.* CLUTE. [Dec.,

Opinion of the Court, per FOLGER, J.

sonal restriction from voting for any officer who may be elective, or whom it may declare elective, save such restriction as is imposed by the Constitution, for from that it is especially prohibited. But it may, in the exercise of its judgment for the public good, limit the number from whom the elector may select, for thus to legislate is within the general and sovereign power of legislation, which it constitutionally possesses.

2d. That the statute impairs a constitutional right of every elector to be chosen to any office, as seems to be claimed. The statute does not of its own force take away from Clute the right to be voted for to the office of superintendent of the poor. It needed, before it so operated, that he should have made his choice, and should have acted upon it. The law of itself did not affect him until of his volition he took the office of supervisor. As a general rule, any one may waive a personal right, be it constitutional or statutory, and may relinquish one advantage to secure another in his view as great. And it was when Clute became supervisor that he brought himself within the restriction of the act of 1853. He was not bound to become a supervisor, and if he had not, no question could have been made of his eligibility for superintendent. And if it be said that he had an equal right to seek either office or both, it is answered, that public office is not created for the benefit of the individual, but for that of the whole people. So long as the convenience and advantage of the people is the object sought and attained in legislation in regard to the qualifications for statutory offices, it cannot be said that the rights of any individual are unduly affected.

We are, therefore, of the opinion that the defendant Clute was not, at the general election in 1871, eligible to the office of superintendent of the poor of the county of Schenectady.

The second question to be considered is whether Furman, the relator, was, at the general election of 1871, duly elected to the office. Neither a majority nor a plurality of all the ballots found in the boxes were for him. He had but a minority of them.

It is the theory and the general practice of our government that the candidate who has but a minority of the legal votes cast does not become a duly elected officer. But it is also the theory and practice of our government, that a minority of the whole body of qualified electors may elect to an office, when a majority of that body refuse or decline to vote for any one for that office. Those of them who are absent from the polls, in theory and practical result are assumed to assent to the action of those who go to the polls; and those who go to the polls, and who do not vote for any candidate for an office, are bound by the result of the action of those who do; and those who go to the polls and who vote for a person for an office, if for any valid reason their votes are as if no votes, they also are bound by the result of the action of those whose votes are valid and of effect. As if, in voting for an office to which one only can be elected, two are voted for, and their names appear together on the ballot, the ballot so far is lost. The votes are as if for a dead man or for no man. They are thrown away; and those who cast them are to be held as intending to throw them away, and not to vote for any person capable of the office. And then he who receives the highest number of earnest valid ballots, is the one chosen to the office.

We may go a step further. They who, knowing that a person is ineligible to office by reason of any disqualification, persistently give their ballots for him, do throw away their votes, and are to be held as meaning not to vote for any one for that office. But when shall it be said that an elector so knows of a disqualification rendering ineligible the person, and knowing, persistently casts for him his ballot? There may be notice of the disqualifying fact, and of the legal effect of it, given so directly to the voter, as that he shall be charged with actual knowledge of the disqualification.

There may be a disqualifying fact so patent or notorious, as that knowledge in the elector of the ineligibility may be presumed as matter of law. In modern times Lord DENMAN, C. J., thus puts a case: "No one can doubt that if an elector

would nominate and vote only for a woman to fill the office of mayor, or burgess in parliament, his vote would be thrown away; there the fact would be notorious, and every man would be presumed to know the law upon that fact." (*Gosling* v. *Veley*, 7 Ad. & Ell., N. R., 406–439; 53 Eng. Com. Law, 406.) In the same case, the learned judge says that "the result of the decisions appears to be this: where a majority of electors vote for a disqualified person, in ignorance of the fact of disqualification, the election may be void or voidable, or, in the latter case, be capable of being made good according to the nature of the disqualification. The objection may require ulterior proceedings to be taken before some competent tribunal, in order to be made available; or it may be such as to place the elected candidate on the same footing as if he never had existed, and the votes for him were a nullity." And then, referring doubtless to the *viva voce* manner of voting in England, and to the manner of keeping of poll-books there, and to the fact of the number of electors there being small, so that for whom each elector has voted is known, and he may be safely allowed to recall his vote for an ineligible person, and give it for another eligible, the learned judge continues: "But in no such case are the electors who vote for him deprived of their vote if the fact becomes known and is declared while the election is still incomplete. They may instantly proceed to another nomination and vote for another candidate. If it be disclosed afterward, the party elected may be ousted and the election declared void; but the candidate in the minority will not be deemed *ipso facto* elected. But where an elector, before voting, receives due notice that a particular candidate is disqualified, and yet will do nothing but tender his vote for him, he must be taken voluntarily to abstain from exercising his franchises."

To which we add, that not only must the fact which disqualifies be known, but also the rule or enactment of law which makes the fact thus effectual.

In the multitude of cases in which the question has arisen, we think that up to this point, there is no essential difference

of result.   All agree that there must be prior notice to, or
knowledge in the elector of fact and law, to make his vote so
ineffectual as that it is thrown away.   But some say that if
there be a public law, declaratory that the existence of a cer-
tain fact creates ineligibility in the candidate, the elector
having notice of the fact, is conclusively presumed in law to
have knowledge of the legal rule, and to be deemed to have
voted in persistent disregard of it.   Others deny that the
maxim, "*Ignorantia juris excuset neminem*" (even with the
clause of it, "*quod quisque scire tenetur*," not often quoted,
and of which we are reminded by the very thorough brief of
the learned counsel for the relator), can be carried to that
length, and insist that there does not apply to this question
the rule that all citizens must be held to know the general
laws of the land, and the special law affecting their own
locality.

That maxim, in its proper application, goes to the length
of denying to the offender against the criminal law a justifi-
cation in his ignorance thereof; or to one liable for a breach
of contract, or for civil tort, the excuse that he did not know
of the rule which fixes his liability.   It finds its proper
application when it says to the elector, who, ignorant of the
law which disqualifies, has voted for a candidate ineligible,
your ignorance will not excuse you and save your vote; the
law must stand, and your vote in conflict with it must be lost
to you.   But it does not have a proper application when it is
carried further, and charges upon the elector such a presump-
tion of knowledge of fact and of law as finds him full of the
intent to vote in the face of knowledge, and to so persist, in
casting his vote for one for whom he knows that it cannot
be counted, as to manifest a purpose to waste it.   The maxim
itself concedes that there may be a lack of actual knowledge
of the law.   For it is *ignorance* of it which shall not excuse.
Then the knowledge of the law, to which each one is held, is
a theoretical knowledge; and the doctrine urged upon us
would carry a theoretical knowledge of the statute further
than goes the statute itself.   The statute but makes ineffectual

to elect the votes given for one disqualified. The doctrine would make knowledge not actual, of that statute thus limited, waste the votes of the majority, and bring about the choice to office by the votes of a minority. We are not cited to nor do we find any decision to that extent of any court in this State. The industrious research of the learned counsel for the relator has found some from courts in sister States. *Gulick* v. *New* (14 Ind., 97) is to that effect. *Carson* v. *McPhetridge* (15 id., 331) follows the last cited case. *Hatcheson* v. *Tilden* (4 Har. & McH., 279) was a case at Nisi Prius, and is to that effect. With respect for these authorities, we are obliged to say that they are not sustained by reasoning which draws with it our judgment. *Commonwealth* v. *Read* (2 Ashmead, 261) is also cited. But that was a case of a board of twenty, assembling in a room to elect a county treasurer. On motion being made to elect *viva voce*, a protest was made that the law under which they were acting prescribed a vote by ballot. Thus *actual notice* of law and fact was brought directly to each elector before voting. Nineteen persisted in voting *viva voce*. These were held to be wasted votes. One voted by ballot; and his vote was held to prevail, and the person he voted for to be elected. *Commonwealth* v. *Cluley* (56 Penn. St. Rep., 270) is also cited. But the language of the court there is: "The votes cast at an election for a person who is disqualified from holding an office are not nullities. They cannot be rejected by the inspectors, or thrown out of the count by the return judges. The disqualified person is a person still, and every vote thrown for him is formal." And that was the case of one who was ineligible by reason of having held the office of sheriff of a county, and became a candidate in the same county for the same office before the lapse of time prescribed by the Constitution; a case in its facts quite like this in hand.

The relator also cites many instances of the action of legislative bodies and their committees. As to these, a respectable authority on these questions has remarked, "that they cannot be said to afford any precise or useful principle"

(1 Peckwell, 500); and learned counsel, arguing in support of the principle now claimed by the relator, has conceded that " no fixed principle is established by the decision of com-mittees " (*Galway Election Cases*, 2 Moak Eng. Cases, 714); and it may safely be said that they are not so conclusive and satisfactory as judicial determinations, as it is difficult to arrive at the exact principle upon which the votes of so many as constitute a legislative body are put. Besides that, they are not uniform, but quite diverse in their results, as appears from the citations of the counsel of the relator, and the instances noted in 56 Penn. St. Rep. (*supra*).

We have consulted many of the authorities cited to us from the English books; and in them it will be found, we think, that where it was held that votes for an ineligible person would be treated as thrown away, it was not extended beyond cases in which there was actual notice of fact and of law to the voters before their votes were cast. (*Gosling* v. *Veley*, *supra ; Rex* v. *Hawkins*, 10 East., 211; *Claridge* v. *Evelyn*, 5 Barn. & Ald., 81; Douglass, 398 *n.* [22]; *Rex* v. *Parry*, 14 East., 549; *Rex* v. *Bridge*, 1 Maule & Selw., 76.)

And there are American authorities which hold that if a majority of those voting by mistake of law or fact happen to cast their votes upon an ineligible candidate, it by no means follows that the next to him in poll shall receive the office. (*Saunders* v. *Haynes*, 13 Cal., 145; *State* v. *Giles*, 1 Chand. [Wis.], 112; *State* v. *Smith*, 14 Wis., 497.) And in Dillon on Mun. Corp. (p. 176, § 135) it is stated that unless the votes for an ineligible person are expressly declared to be void, the effect of such person receiving a majority of the votes cast is, according to the weight of American authority and the reason of the matter (in view of our mode of election, without pre-vious binding nominations, by secret ballot, leaving each elector to vote for whomsoever he pleases), that a new elec-tion must be had, and not to give the office to the qualified person having the next highest number of votes. And this view is sustained by a preponderance of the authorities cited by the author in the foot note, some of which are cited above.

And in *The Queen* v. *Mayor*, *etc.* (3 Law Rep. [Q. B.], 629), after holding that though the electors had actual notice of the fact which had been adjudged by the courts to disqualify, yet knowledge or notice in the elector of the adjudication could not be presumed. It is further said : " It is not enough to show that the voter knew the fact only ; but it is necessary to show sufficient to raise a reasonable inference that he knew that the fact amounted to a disqualification. It cannot be said in all cases that the mere knowledge of a fact, which in law disqualifies a candidate, must be taken to be knowledge of all the accompanying circumstances."

We think that the rule is this : the existence of the fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector, as that to give his vote therewith indicates an intent to waste it. The knowledge must be such, or the notice brought so home, as to imply a willfulness in acting, when action is in opposition to the natural impulse to save the vote and make it effectual. He must act so in defiance of both the law and the fact, and so in opposition to his own better knowledge, that he has no right to complain of the loss of his franchise, the exercise of which he has wantonly misapplied.

To state a truism ; our theory of government by the people is upon the assumption that the people as a whole, are intelligent of their rights and interests, and are honestly and earnestly concerned in the due and wise administration of affairs, and zealously alive to the need of good and fitting men in the various places of public trust, and hold in high esteem the privilege of suffrage, and are unready to pretermit its exercise or to exercise it meaninglessly. It is much to presume, with this as our starting point, that any considerable body of electors will purposely so exercise their right of electing to office as that it shall be but an empty form ; and that going through with outward signs of an election they will of intent so cast their ballots, as that they will be votes wasted.

Now the finding in this case is, that there was no proof of actual notice of Clute's ineligibility, nor of any facts from which notice could be implied, save that he was a supervisor.

There was but this fact, and the law upon the statute book; sufficient in themselves, as we hold, to render him ineligible.

But therefrom to give the office to the relator, it is first to be presumed, as a matter of law, that near 300 of those who voted for Clute had knowledge of the fact that he was supervisor; had knowledge of the existence of the act of 1853; and knew that the fact and the law, concurring thus, he was ineligible to receive and avail himself of their votes in his favor, and knew that their votes given to him were wasted, without effect upon the count.

It is to be presumed further, that knowing this, they all, though seemingly desirous of taking an effectual participation in the choice of a person to the office of superintendent, deliberately so acted as that they are assumed to have persisted against knowledge; determined to "do nothing but tender their vote for him."

It is not in accordance with common sense, and we find no rule or authority so stringent as to compel us to that result.

There is one other question remaining. The act of 1829 says that no supervisor shall be appointed *to hold* the office, etc.; and the act of 1853 says that no supervisor shall be elected or appointed *to hold* the office, etc.

The learned and ingenious counsel for the defendant urges that the manifest intention of the legislature was to inhibit, not the *election* or appointment to the office of superintendent, but the *holding* of the two offices by the same person. And from this he deduces the proposition that when Clute accepted the office of superintendent he vacated that of supervisor, and could continue to hold the former.

We do not so think. The legislature intended that the same person should not hold the two offices at the same time; and to effect this, it prohibited the election of a supervisor to hold the office of superintendent. It made him ineligible, not merely to holding, but to an appointment or election to hold.

The language is not that he shall not hold, but that he shall not be elected or appointed to hold, and operates upon the very first step in the process toward holding, and stops that. He can never hold but by appointment or election; and the act says that he shall not be eligible to that election or appointment. So that he never can begin to hold, and cannot, by resigning the one or accepting the other, bring himself within the reason of the cases cited, of which *The People* v. *Carrique* (2 Hill, 93) is one. There the defendant was held to be eligible to the office which he accepted; but as that was held to be incompatible with the one which he already filled, his acceptance of the last *ipso facto* vacated the first.

We are therefore of the opinion that the judgment of the General Term should be reversed, and that of the Special Term affirmed.

All concur.

Judgment accordingly.