State of Missouri, ex rel. John Herget, *v.* Richard
Walsh, Respondent.

### April 22, 1879.

1. Where an ineligible candidate receives the highest number of votes, the votes cast for such person so far avail as to prevent the election of a qualified candidate who has received the next highest number of votes.

2. Where the voter can make his vote effective only by voting for an ineligible candidate, and thus securing a new election, at which the majority can elect, it cannot be assumed, nor upon grounds of public policy held, that the voter intended to throw away his vote.

3. Though the fact that the candidate died on the morning of the election, before the polls were opened, is known to the voters and the judges of election, if the deceased receives the highest number of votes they avail to defeat the opposing candidate.

Application for *mandamus.*

*Demurrer sustained and petition dismissed.*

Henderson & Shields, for relator, cited : *Gulick* v. *New,* 14 Ind. 93 ; *The State ex rel.* v. *Boal,* 46 Mo. 528 ; 53 Mo. 114 ; 50 N. Y. 451 ; 4 Brews. 454 ; Bright. 126 ; L. R. 3 Q. B. 629.

Leverett Bell, for respondent, cited : 1 Wag. Stats. 569, sects. 25, 32 ; Cooley's Const. Lim. 620 ; Dill. on Mun. Corp., sect. 135 ; McCrary on Elec., sects. 231–235 ; *The People* v. *Molliter,* 23 Mich. 341 ; *The State* v. *Smith,* 14 Wis. 497 ; *The State* v. *Vail,* 53 Mo. 115 ; *The Commonwealth* v. *Cluley,* 56 Pa. St. 270 ; *The People* v. *Clute,* 50 N. Y. 451 ; 3 Cent. L. J. 781.                                    ＼

Hayden, J., delivered the opinion of the court.

The question presented by this case would have been more properly raised by demurrer to the petition for *mandamus,* instead of, as at present, by demurrer to the reply to the return. This is, however, immaterial, as the view we take disposes of the whole case. The essential facts are that, at the election of April 1, 1879, the relator was a candidate for member of the House of Delegates of the

Municipal Assembly of the City of St. Louis from the Twenty-second Ward ; that the only other candidate was Eugene Miltenberger, who died about three hours before the opening of the polls. The allegation of the petition, though denied by the return, must on demurrer be taken as true, that every voter that voted for Miltenberger knew, at the time of voting, that Miltenberger was dead, and had died at the time just stated ; that the judges of election had the same knowledge, yet received the ballots, counted them, and made returns to the defendant, by whom and assistants the votes were examined and cast up. There were but two hundred and fifty-six ballots cast, of which one hundred and forty bore the name of Miltenberger, the rest being for the relator. The relator claims to be entitled to the certificate, as having received a majority of the legal votes cast.

The present is not the case of a disqualified person who had received the highest number of votes, and a claim to the certificate, founded on such disqualification, on the part of an eligible candidate who has received the next highest number of votes. Notwithstanding some differences of opinion, arising partly from following English decisions which are neither satisfactory in themselves nor adapted to our circumstances, the great weight of American authority supports the rule that where, an ineligible person receives the highest number of votes, the votes cast for such person so far avail as to prevent the election of the qualified candidate who has received the next highest number of votes, unless there is some statutory provision declaring the votes cast for the ineligible person void. See authorities collected in Cooley's Const. Lim. 781, and note ; Dill. on Mun. Corp., sect. 135 ; *In re Corliss*, 16 Am. L. Reg. (N. S.) 15, and note. Here, the case is of votes cast for a man known by the voters, when they voted, to be dead ; and the facts appear, at first sight, to present the typical instance put in the English cases, of " voting for a dead man or the man in the

moon." *Queen* v. *Mayor*, 3 Q. B. 638; *Regina* v. *Coakes*, 3 El. & Bl. 254; *Rex* v. *Hawkins*, 2 Dow. 148. It cannot here be urged that the person, though disqualified, "is a person still." Yet, unless we depart from the principle upon which the only sound rule rests, we must hold that the ballots upon which was the name of Mr. Miltenberger are properly counted, not for himself, for he was not in existence, but against his opponent, so far as to render a new election necessary. The relator had no plurality of votes. The will of the electors was declared against him. He is not "the person having the highest number of votes," to whom the certificate must, under the statute, be given; for these words imply that the successful candidate shall be the choice of the majority of voters who vote. Thus the case contemplated by the statute is not met. Through the death of one of the candidates immediately before the polls are open, an exigency arises not contemplated by the law, and the obvious consequence is a new election. It is not the accidental death of his opponent, but the votes of the electors, which should give the certificate to a candidate.

If it is true that a majority vote operates only to elect, and, failing of that, goes for nothing, then the most innocent mistake of fact on the part of the majority — as, the age of a person voted for — might avail to elect a candidate who had received only a few scattering votes. It is said, on the other hand, that if the American doctrine is correct, votes cast for a fictitious person avail to defeat an eligible candidate; that if the voters choose to stay away, or, what is the same, throw away their votes, those votes should not be counted as against valid votes. The force of this argument lies in the assumption of an intent to throw away the vote. If the voter can make his vote effective only by voting in a certain way, and if the result of his voting in this way is to secure a new election, at which the majority can elect, how can it be assumed that the voter intended to throw away his vote? If the death of a candidate of a political

party takes place, as here, immediately before the election, there is no time for organization or for preparing new ballots. Not only do our laws recognize primary organization and minutely describe what ballots shall be legal, but the modes of selecting candidates for political offices are parts of the customs of the country. If the sudden death of a candidate renders the votes of electors ineffective for some purposes, it is not therefore to deprive the voter of his vote. The majority are not obliged to fold their hands, nor are the minority entitled, because of the death, to prevail over the majority; yet this would be the result if the majority vote is not to be counted against the minority candidate. But the majority of voters, so far from desiring or intending to throw their votes away, wish to use them to their utmost effect; and it is only by a fiction, raised, if at all, by the law, that the majority in such cases throw their votes away.

This presumption of an intent on the part of the voter that his vote should not, for any purpose, be effectual, any more than if it were blank paper, is indeed to a great extent a fiction of the English courts, and political considerations have probably contributed to produce it. Out of it arise the difficulties and disagreements of those courts which have followed the English theory. On the one hand, it is held — a doctrine which is consistent with legal principle and affords a working rule — that as ignorance of law, which every one is bound to know, excuses no one, therefore the voter consents that his vote for the ineligible person shall not count for any purpose. *Gulick* v. *New*, 14 Ind. 93; *Price* v. *Baker*, 41 Ind. 572; *Hatcheson* v. *Tilden*, 4 Har. & M. 279; *The Commonwealth* v. *Cluley*, 56 Pa. St. 275, per Thompson, C. J., dissenting. But so harsh is the operation of the rule in depriving the sincere voter of his vote, and so directly opposed is the result produced to the purpose of voting, that the consequence has been either a denial of the application of the rule that knowledge of

the law is presumed, or a balancing of the presumption of knowledge of the law against the presumption that the voter did not intend to throw away his vote, and a rule which involves minute inquiries, which are both embarrassing and against the policy of American law, into the intention of the voters and their legal information. — *Queen* v. *Mayor*, *supra*; *The People ex rel.* v. *Clute*, 50 N. Y. 451.

It is true that, as in Wilkes's case, who was three times declared ineligible by the House of Commons and three times voted for by a majority of the voters, the intent may be apparent on the part of the majority to defy the law; and it may, on grounds of public policy at least, be pronounced that in such cases the persons so voting intend to throw away their votes. But the dangerous extent to which the English doctrine is liable to be carried, and its unjust effect as resulting in the election of minority candidates, seem now to be appreciated by English judges. *Queen* v. *Mayor*, *supra*. If, in this country, mischief is likely to arise from such perverse political feeling, legislative provision can easily be made without defeating the will of law-abiding voters.

Allowing all that has been said in the petition to be true, no presumption arises here that the majority of the voters voting at the election intended to throw their votes away. It has yet to be shown that it is a rule of law to deny any legal effect to a lawful act because the fullest effect cannot be given to that act. Though, owing to the accident of death, these votes could not avail to elect, they not the less distinctly indicated the will of the electors of the ward. The result was clearly a failure to elect in the manner contemplated by the charter.

The demurrer is sustained; and, as no amendment can avail the relator, the petition will be dismissed. All the judges concur.