# SHERIDAN, Appellant, v. CITY OF ST. LOUIS.

### Division One, June 20, 1904.

1. **LEGISLATIVE BODY: Ousting Member: Seating Minority Candidate.** The House of Delegates of the city of St. Louis, being empowered by the city charter with power to determine "the qualifications and election of its own members," has authority to determine that a candidate who has received the largest number of votes at the polls, is not qualified to sit as a member because of his former conviction of crime, and to oust him therefrom, but it does not have the power to declare that the candidate who received the next highest number of votes shall be admitted to its membership, because by determining that the majority candidate was ineligible it created a vacancy, and the charter provides that in case of a vacancy a popular election shall be held to fill it.

2. ———: ———: ———: **Election: Vacancy.** The House, by deciding that the candidate receiving the highest number of votes was ineligible, did not decide that he had not been elected, nor did it thereby undertake to pass on an election contest, but simply determined that, admitting that he had been elected, he was not qualified to sit in the body, and, therefore, that a vacancy existed.

3. ———: ———: ———: **Votes for Ineligible Candidate: Thrown Away.** A majority or plurality of votes for an ineligible candidate at a popular election, while conferring upon him no right to the office, is, in the absence of any statute declaring such votes void, so far effectual as to prevent the election of a candidate who receives a less number of votes. Votes cast for an ineligible candidate are not thrown away, and the minority candidate is not entitled to the office.

4. ———: **Vacancy: Seating Minority Member: Salary.** Where a vacancy occurs in a legislative body which can be legally filled only by a popular election, the member wrongfully seated by that body is not entitled to the salary attaching to the office. The salary attaches to the legal or true title, not to the mere colorable title, and hence an officer who is only *de facto* such, and not *de jure* such, is not entitled to the salary.

Appeal from St. Louis City Circuit Court.—*Hon. Wm. Zachritz,* Judge.

AFFIRMED.

*T. J. Rowe* for appellant.

Appellant insists that the agreed statement of facts herein shows that he was both the *de facto* and the *de jure* member of the House of Delegates from the Fourth ward of the city of St. Louis. He has been indicted and convicted of having taken a bribe as such member of the House of Delegates of the city of St. Louis, and his case is now pending on appeal in Division 2 of this court. If the appellant was either a *de jure* or a *de facto* officer, he is entitled to his salary. The House of Delegates, under the charter provision, was the sole judge of the election of the member of the House from the Fourth ward. The House of Delegates decided that John A. Sheridan was the duly elected member of the House of Delegates from the Fourth ward, and its decision is final and conclusive. State ex rel. v. Bersch, 83 Mo. App. 657. The House of Delegates are not only the judges of the election of its members, but the sole judges, and they have declared that plaintiff was elected. The authorities all hold that, where a legislative body has power to act, the correctness of its action can not be questioned by the courts. Vogel was not expelled, but he was declared unqualified, and Sheridan was declared elected from the Fourth ward.

*Charles W. Bates* and *Benjamin H. Charles* for respondent.

(1) When the House of Delegates declares one of its members, who had received a majority of the votes at an election for said office, disqualified from holding the office, a vacancy is thereby created; but the candidate

who had received the next highest number of votes, less than a plurality, is not elected. State v. Vail, 53 Mo. 115; State ex rel. v. Walsh, 7 Mo. App. 142; Cooley, Const. Lim. (6 Ed.), p. 780; 1 Dillon, Mun. Corp. (4 Ed.), sec. 196; McCreary on Elections (4 Ed.), secs. 328-331a. (2) The House of Delegates has no authority to elect members of the House. Charter, City of St. Louis, art. 3, sec. 4; State v. Kramer, 150 Mo. 89. (3) Even where the House of Delegates is by law the sole judge of the qualification, elections and returns of one of its members, it is always a judicial question to determine whether on the facts the House was acting within the law. 1 Dillon, Mun. Corp. (4 Ed.), sec. 204. (4) Whatever may have been Sheridan's rights in the House of Delegates, or whatever his obligations may be determined to be by any tribunal before whom that question may come, he can not obtain the affirmative aid of the court in awarding him his salary on a record showing such facts as clearly, as matter of law, prove that he could not be a member. State v. Albin, 44 Mo. 346; State v. Newman, 91 Mo. 445; People ex rel. v. State Board (N. Y.), 14 L. R. A. 646.

MARSHALL, J.—This is an action to recover six hundred dollars salary alleged to be due the plaintiff as a member of the House of Delegates of the city of St. Louis, representing the Fourth ward, from May 26, 1899, to April 2, 1901.

The answer is a general denial, with a special plea that William Vogel was elected the member of the House from the Fourth ward at the election held on April 4, 1899, for a term of two years thereafter; that he was commissioned, qualified and entered upon the discharge of the duties of the office, and that on May 26, 1899, the House adopted a resolution declaring that said Vogel was ineligible to hold said office and that his election was void, and declaring further that the plaintiff received the highest number of votes cast at said elec-

tion for the office and declared that Vogel was ineligible and the plaintiff elected, the theory of the answer being that if Vogel was ineligible, he yet having received a majority of the votes cast at the election and the plaintiff having received only a minority of such votes, the effect was to create a vacancy, which could only be filled by an election by the people, under the city charter, and that the House had no power to declare plaintiff elected or elect him to fill the vacancy.

The case was tried in the circuit court upon an agreed statement of facts, which, briefly stated, showed the facts to be as follows:

An election for a member of the House of Delegates from the Fourth ward, for a term of two years next succeeding, was held on April 4, 1899, at which William Vogel received 809 votes, the plaintiff, John A. Sheridan, received 781 votes, and Israel Weinsteine received fourteen votes. Vogel was declared elected, was commissioned, qualified and entered upon the discharge of the duties of the office. On April 17, 1899, John A. Sheridan filed a petition with the clerk of the House, addressed to the House, in which he recited the election and the result thereof as above stated, and then stated that Vogel did not possess the qualifications necessary for a member of the House, because he had been convicted of corrupt practices or crimes, in that on eight different occasions stated, between July 20, 1892, and March 6, 1895, he had been prosecuted in the St. Louis Court of Criminal Correction, for selling lottery tickets, and had pleaded guilty or had been found guilty of such offense, in each case, and had been fined therefor. The petition concluded with a statement that Vogel was ineligible, and that the petitioner possessed the necessary qualifications, and that he had received the highest number of votes of any qualified candidate for the office, and asked that he be declared the duly elected member of the House from the Fourth ward. On May 26, 1899, the House adopted the following resolution:

"Whereas, Wm. Vogel is ineligible to hold a seat in this House because of violations of a provision of the charter, and his election is, therefore, null and void.

"Whereas, John A. Sheridan received the highest number of votes cast at said election for this office, therefore, the said Vogel is hereby declared ineligible and Mr. John A. Sheridan duly elected to the body."

Thereupon said Sheridan qualified as such member, entered upon the duties of the office, and served as such during the remainder of the term, ending April 2, 1901, and was the only person who was recognized by the House as such member from the Fourth ward. On March 12, 1901, the House adopted a resolution reciting that said Sheridan had been declared by it to be duly elected as such member; that the House is the sole judge of the qualifications of its own members; that said Sheridan had served without pay, and authorizing the auditor to draw a warrant on the treasurer for his pay. The auditor did not do so, and after demand upon the city for the sum of six hundred dollars, the pay for two years, this suit was instituted. The trial court entered judgment for the defendant and the plaintiff appealed.

## I.

The question for decision in this case is the power of the House of Delegates of the city of St. Louis to declare one who has received a minority of the votes cast at an election for a member of the House, to be elected, where the person who received a majority of such votes is ineligible.

Section 4 of article 3 of the charter of St. Louis provides that the House of Delegates shall consist of one member from each ward "to be chosen every two years by the qualified voters of the several wards."

Section 8 of article 3 of said charter provides that "each House . . . shall be the sole judge of the qualifications, election and returns of its own members,

and in case of a tie vote shall certify the same to the mayor, who shall order a new election.''

Section 7 of article 3 of said charter provides that ''whenever a vacancy occurs, from any cause, in the office of any member of the assembly, the mayor, upon information thereof, shall, by proclamation, order an election to fill such vacancy for the unexpired term,'' etc.

Under the facts here in judgment, there was no question as to the election of Vogel before the House for it to determine. There was no election contest pending before the House, between Sheridan and Vogel, for the House to decide. Sheridan did not notify Vogel that he intended contesting his election as would have been necessary if the election was to be contested. On the contrary, he filed a petition with the clerk of the House, addressed to the House, in which he recited that Vogel had received a majority of the votes cast at the election for the office. The only question, therefore, which was presented to the House for its determination was whether Vogel was qualified. The House had power to determine that question and it did so by declaring him disqualified, and by ousting him. Such a determination created a vacancy in the House from the Fourth ward. Having reached that conclusion, the House exhausted its power, for under the charter the House had no power to fill the vacancy, but it could only be filled by an election by the people.

The House, however, proceeded upon the theory, which is here contended for by the plaintiff, that as Vogel was ineligible, the votes cast for him were thrown away, and that as the plaintiff received the highest vote cast at the election for any *eligible* candidate, he is entitled to the office, and that the House had the power to so declare.

This contention finds no countenance in the charter of St. Louis. Section 4 of article 3 requires the members of the House to be chosen by the qualified voters of

the ward. Section 8 of article 3 provides that in case of a tie vote, the matter shall be certified to the mayor, who shall order a new election. And section 7 of article 3 provides that in case of a vacancy, the mayor shall order an election to fill the vacancy. In every contingency, therefore, the charter requires that there shall be an election by the people. It is true that the House had power to determine a contest over the election, but as above pointed out, there was no such question presented to the House in this case, for there was no attempt made by the plaintiff to contest Vogel's election. The contest was as to his qualification, and not as to his election.

It is argued, however, that as Vogel's disqualification existed at the date of the election, he was then ineligible, and hence the votes cast for him were thrown away, and as the plaintiff received the highest number of votes that were cast for any qualified candidate, he was entitled to the office. It must be noted, however, that such a question could only arise in a contested election case between Sheridan and Vogel, and that there never was such a contest. It could not be raised so as to confer power upon the House to decide the question, in the manner or form that was adopted in this instance.

But aside from this, such a contention is wholly untenable and contrary to the rule of law in this State, as it is contrary to the great weight of authority in America. The English courts hold that votes cast for an ineligible candidate are thrown away, and that if a majority of the votes are cast for an ineligible candidate, the eligible candidate who receives the next highest number of votes is entitled to be declared elected. [Cooley's Const. Lim. (6 Ed.), p. 780, note 1, and English cases cited.] And the same rule seems to obtain in Indiana. [State v. Gallagher, 81 Ind. 558; Price v. Baker, 41 Ind. 572; State v. Johnson, 100 Ind. 489; Copeland v. State, 126 Ind. 51.]

But, "the general rule is that a majority or a

plurality of votes for an ineligible candidate at a popular election, while conferring upon him no right to the office, is, in the absence of any statute declaring such votes void, so far effectual as to prevent the election of a candidate who received a less number of votes." [10 Am. and Eng. Ency. Law (2 Ed.), p. 758, and cases cited in note.] The cases cited in the note to the text show that this is the rule in California, Georgia, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Nebraska, New York, Pennsylvania, Rhode Island and Wisconsin.

The same author also points out that in some States a distinction is drawn between cases where the voters knew or were charged with notice of the ineligibility of the candidate, when they voted for him, and where they had no such knowledge or notice. In some States it is held that where the majority of the voters had such knowledge or notice at the time they voted for the ineligible candidate, they intentionally threw away their votes, and hence the candidate who received the next highest number of votes, although less than a majority of the votes cast, is entitled to the office. Other States, however, refuse to recognize any such distinction, and hold that if the Legislature intends any such rule to obtain, it must expressly so declare, for the courts will not hold any one to be elected unless he received a majority of the votes cast at the election for the office. [State ex rel. v. Giles, 2 Pin. (Wis.) 166; Barnum v. Gilman, 27 Minn. 466; People ex rel. v. Clute, 50 N. Y. 451.]

Judge Cooley adheres to the general American rule above stated, without the qualifications or modifications indicated. [Cooley's Const. Lim. (6 Ed.), p. 780.]

Judge Dillon takes the same view of the law. [1 Dillon on Mun. Corp. (4 Ed.), sec. 196.]

Judge McCrary discusses the question here under consideration very fully and takes a very decided stand in favor of the general rule above stated, adding: "Any

doctrine which opens the way for minority rule in any case is anti-republican and anti-American.''.

Mechem's Public Offices and Officers, sec. 206, discusses the question and cites the English and many of the American cases, and says the great weight of authority in America, which is supported by the better reason, is in favor of the general rule above stated.

Throop on Public Officers, secs. 160 to 163, learnedly discusses the subject and states the American rule to be that in the absence of a statute declaring such votes void, votes cast for an ineligible candidate are not considered as thrown away, and the minority candidate is not entitled to the office.

The question under consideration has twice undergone adjudication in this State, first, by this court in State ex rel. Atty.-Genl. v. Vail, 53 Mo. l. c. 115, and, second, in State ex rel. v. Walsh, 7 Mo. App. 142. State ex rel. v. Vail, supra, was a proceeding by *quo warranto,* instituted by the Attorney-General, ex officio. The defendant, James H. Vail, and Louis F. Dinning were the opposing candidates for judge of the circuit court of the Thirteenth Judicial district. Dinning received a majority of the votes, but the Governor, under the power then conferred upon him to issue commissions, refused to issue a commission to Dinning, but, on the contrary, issued a commission to Vail, who had received less than a majority of the votes cast at the election for that office. In his return to the writ of *quo warranto,* Vail set up that Dinning was ineligible to the office for various reasons, and claimed that he was therefore entitled to the office because he received the highest number of votes of any qualified candidate, and that the votes cast for Dinning were thrown away. This court, per NAPTON, J., referred to the English rule and the rule that obtains in Indiana, and pointed out that a contrary rule prevailed in Wisconsin, Pennsylvania, Louisiana, Maine and Georgia, and followed the rule that prevails in those

States, saying: "To declare a candidate for an elective office elected, who has received but a few votes, on the ground that his competitor, who received perhaps twice as many, was disqualified, would not accomplish the will of the electors. The object of an election is to ascertain the choice of the majority. If a disqualified candidate receives a thousand votes and his competitor only a hundred, to pronounce the latter elected is not in accordance with any ascertained will of the electors, unless it may be inferred that the votes cast for the disqualified candidate were cast with a knowledge of his inability to take the office—an inference which could not be drawn where the disqualifications are such as are enumerated in the pleadings in this case. It is unnecessary to determine whether it would be the rule in any case of disqualifications whether patent or latent." Accordingly a judgment of ouster was entered against the defendant.

State ex rel. v. Walsh, 7 Mo. App. 142, was a proceeding by mandamus to compel the city register, who at that time declared the result of elections for city officers, to issue to relator a certificate of election as a member of the House of Delegates from the Twenty-second ward. The relator, Herget, and one Miltenberger were the opposing candidates for election to that office. Miltenberger died about three hours before the opening of the polls. The voters all knew that he was dead when they voted for him, yet the majority of the votes were cast for him. The theory of the relator was that the majority threw away their votes intentionally, and that as he was the only live candidate who was voted for at the election, he was entitled to the office, notwithstanding he did not receive a majority of the votes cast at the election for the office. The St. Louis Court of Appeals denied the peremptory writ, in an opinion by HAYDEN, J., which is so able that the following excerpt is taken from it:

"Notwithstanding some differences of opinion, arising partly from following English decisions which are

neither satisfactory in themselves nor adapted to our circumstances, the great weight of American authority supports the rule that where an ineligible person receives the highest number of votes, the votes cast for such person so far avail as to prevent the election of the qualified candidate who has received the next highest number of votes, unless there is some statutory provision declaring the votes cast for the ineligible person void. [See authorities collected in Cooley's Const. Lim., 781, and note; Dill. on Mun. Corp., sec. 135; In re Corliss, 16 Am. L. Reg. (N. S.) 15, and note.] Here, the case is of votes cast for a man known by the voters, when they voted, to be dead; and the facts appear, at first sight, to present the typical instance put in the English cases, of 'voting for a dead man or the man in the moon.' [Queen v. Mayor, 3 L. R. Q. B. 638; Regina v. Coaks, 3 El. & Bl. 254; Rex v. Hawkins, 2 Dow 148.] It can not here be urged that the person, though disqualified, 'is a person still.' Yet, unless we depart from the principle upon which the only sound rule rests, we must hold that the ballots upon which was the name of Mr. Miltenberger are properly counted, not for himself, for he was not in existence, but against his opponent, so far as to render a new election necessary. The relator had no plurality of votes. The will of the electors was declared against him. He is not 'the person having the highest number of votes,' to whom the certificate must, under the statute, be given; for these words imply that the successful candidate shall be the choice of the majority of voters who vote. Thus the case contemplated by the statute is not met. Through the death of one of the candidates immediately before the polls are open, an exigency arises not contemplated by the law, and the obvious consequence is a new election. It is not the accidental death of his opponent, but the votes of the electors, which should give the certificate to a candidate.

"If it is true that a majority vote operates only to

elect, and, failing of that, goes for nothing, then the most innocent mistake of fact on the part of the majority—as, the age of a person voted for—might avail to elect a candidate who had received but a few scattering votes. It is said, on the other hand, that if the American doctrine is correct, votes cast for a fictitious person avail to defeat an eligible candidate; that if the voters choose to stay away, or, what is the same, throw away their votes, those votes should not be counted as against valid votes. The force of this argument lies in the assumption of an intent to throw away the vote. If the voter can make his vote effective only by voting in a certain way, and if the result of his voting in this way is to secure a new election, at which the majority can elect, how can it be assumed that the voter intended to throw away his vote? If the death of a candidate of a political party takes place, as here, immediately before the election, there is no time for organization or for preparing new ballots. Not only do our laws recognize primary organization and minutely describe what ballots shall be legal, but the modes of selecting candidates for political offices are parts of the customs of the country. If the sudden death of a candidate renders the votes of the electors ineffective for some purpose, it is not, therefore, to deprive the voter of his vote. The majority are not obliged to fold their hands, nor are the minority entitled, because of the death, to prevail over the majority; yet this would be the result if the majority vote is not to be counted against the minority candidate. But the majority of voters, so far from desiring or intending to throw their votes away, wish to use them to their utmost effect; and it is only by a fiction, raised, if at all, by the law, that the majority in such cases throw their votes away.

"This presumption of an intent on the part of the voter that his vote should not, for any purpose, be effectual, any more than if it were blank paper, is indeed to a great extent a fiction of the English courts, and political

considerations have probably contributed to produce it. Out of it arise the difficulties and disagreements of those courts which have followed the English theory.   On the one hand, it is held—a doctrine which is consistent with legal principle, and affords a working rule—that as ignorance of law, which every one is bound to know, excuses no one, therefore the voter consents that his vote for the ineligible person shall not count for any purpose. [Gulick v. New, 14 Ind. 93; Price v. Baker, 41 Ind. 572; Hatcheson v. Tilden, 4 Har. & M. 279; Commonwealth v. Cluley, 56 Pa. St. 275, per THOMPSON, C. J., dissenting.]   But so harsh is the operation of the rule in depriving the sincere voter of his vote, and so directly opposed is the result produced to the purpose of voting, that the consequence has been either a denial of the application of the rule that knowledge of the law is presumed, or a balancing of the presumption of knowledge of the law against the presumption that the voter did not intend to throw away his vote, and a rule which involves minute inquiries, which are both embarrassing and against the policy of the American law, into the intention of the voters and their legal information. [Queen v. Mayor, supra; People ex rel. v. Clute, 50 N. Y. 451.]

"It is true that, as in Wilke's case, who was three times declared ineligible by the House of Commons and three times voted for by a majority of the voters, the intent may be apparent on the part of the majority to defy the law; and it may, on grounds of public policy at least, be pronounced that in such cases the persons so voting intend to throw away their votes. But the dangerous extent to which the English doctrine is liable to be carried, and its unjust effect as resulting in the election of minority candidates seem now to be appreciated by English judges. [Queen v. Mayor, supra.]   If, in this country, mischief is likely to arise from such perverse political feeling, legislative provis-

ions can easily be made without defeating the will of law-abiding voters.

"Allowing all that has been said in the petition to be true, no presumption arises here that the majority of the voters voting at the election intended to throw their votes away. It has yet to be shown that it is a rule of law to deny any legal effect to a lawful act, because the fullest effect can not be given to that act. Though, owing to the accident of death, these votes could not avail to elect, they not the less distinctly indicate the will of the electors of the ward. The result was clearly a failure to elect in the manner contemplated by the charter."

It thus clearly appears that the American rule and the rule in Missouri is that where the majority of the electors vote for an ineligible candidate, they do not thereby throw away their votes, and the eligible candidate who receives the next highest number of votes, being less than a majority, is not entitled to the office. It follows, therefore, that upon the face of the proceedings of the House of Delegates, that body had power to declare Vogel ineligible and to oust him, but when it did so it exhausted its powers. So much of its action as declared relator elected was absolutely void, and conferred no right upon him to the office.

## II.

The plaintiff contends, however, that although he may not have been a *de jure* member of the House of Delegates, nevertheless he was a *de facto* member, and as such performed all the functions of the office, and hence he is entitled to the pay attached to the office.

Throop on Public Officers, sec. 510, says: "In order to maintain such an action" (the author is speaking of a suit for salary), "the plaintiff must be an officer *de jure;* for one who is an officer *de facto* only can not recover," citing in support of the text, Matthews v. Supervisors, 53 Miss. 715; Darby v. Wilmington, 76 N. C.

133.  The same author, in section 517, says: "Although, under the rule laid down by the courts in New York, a voluntary payment by municipality of the salary of one who is merely an officer *de facto*, protects the municipality, yet if it refuses to pay the salary, he can not recover it by action.  As was said, in one of the cases, establishing  the former rule, 'the right to the salary and emoluments of a public office attaches to the true, and not to the mere colorable title; and, in an action brought by a person claiming to be a public officer, for the fees and the compensation given by law, his title to the office is in issue, and if that is defective, and another has the real right, although not in possession, the plaintiff can not recover.  Actual incumbency, merely, gives no right to the salary or compensation.'  So, where a person claiming to be rightfully entitled to a municipal office, on the ground that he held over upon the failure of the appointing power to appoint his successor, applied for a mandamus, to compel the mayor to countersign a warrant of the city comptroller for his salary; and it appeared that the applicant's right to hold over was questionable; the court denied the application, saying: 'The salary and fees are incident to the title, and not to the usurpation and colorable possession of an office. . . .  It does not follow' (because the acts of an officer *de facto* are valid) 'that a right can be asserted and enforced, on behalf of one who acts merely under color of office, as if he were an officer *de jure*.  When an individual claims by action an office, or the incidents to the office, he can only recover upon proof of title.  Possession under color of right may well serve as a shield for defense; but can not, as against the public, be converted into a weapon of attack, to secure the fruits of the usurpation and the incidents of the office.' "

Mechem's Public Offices and Officers, sec. 331, thus states the rule:

"But while the acts of the *de facto* officer are thus valid as to third persons, he can not himself acquire

rights based upon his defective title.  It is well settled,. therefore, that he can not maintain an action to recover the salary, fees, or other compensation attached to the office.  'It is the settled doctrine in this State,' says the court in New York, 'that the right to the salary and emoluments of a public office attach to the true and not to the mere colorable title, and in an action brought by a person claiming to be a public officer, for the fees or compensation given by law, his title to the office is in issue, and if that is defective and another has the real right, although not in possession, the plaintiff can not recover.  Actual incumbency, merely, gives no right to the salary or compensation.'

"The right of the intruder to recover is denied, not. upon the ground of actual fraud on his part, for it often happens that he is in not under a claim of right, but. under a prima facie title, which he can not or may not know to be invalid; nor upon the ground that he is a mere volunteer, and that the government should not be obliged to pay him for his services, for in most cases they are rendered in good faith, and under the expectation, both on his part and on the part of the public, that. he is to receive the emoluments of the office.  The principle is, that the right follows the true title, and the courts will not aid the intruder by permitting him to recover the compensation which rightfully belongs to another."

The rule is thus stated in 23 Am. and Eng. Ency. Law (2 Ed.), p. 396:  "It is a principle of general application that the right of a public officer to the compensation of his office is incident to and dependent upon his right and title to the office.  Hence, if constitutionally ineligible at the time of assuming office, and therefore without title thereto, he is a volunteer and can not recover for his services."

Without further elaboration it follows that the claim to the salary based upon the theory that the relator was a *de facto* officer and as such is entitled to the pay

because he performed the duties of the office, is untenable.

For these reasons the judgment of the circuit court is affirmed.

All concur.