EDWARD P. BARNUM *vs.* CHARLES A. GILMAN.

March 29, 1881.

**Election — Disqualification of Candidate having Plurality of Votes.**—A person who receives less than a plurality of the votes cast at a popular election for lieutenant governor is not entitled to the office, though the next highest candidate, who receives such plurality, is ineligible to the office—the fact of such ineligibility not appearing upon the ballots which he so received.

**Same—Quo Warranto at Suit of Private Person.**—A *quo warranto* will not be issued, without the consent of the attorney general, upon information of a private party having no personal interest in the question distinct from the public, to try the right of an incumbent of a public office to hold the same.

Petition for a writ of *quo warranto.* The facts appearing in the petition and answer are stated in the opinion.

*H. F. Masterson* and *Seagrave Smith*, for petitioner.

*C. K. Davis*, for respondent.

CORNELL, J.    The question of granting leave to the relator, without the consent of the attorney general, to file an information for a *quo warranto* against the defendant, to inquire into and determine his right to the office of lieutenant governor, which he now holds, is presented upon the admissions and averments of his answer to the petition and order to show cause, taking them to be true.    If, upon the showing thus made, the relator is not entitled to the office under any circumstances, he clearly has no interest in any question properly triable by means of the writ, and his application should be denied on that ground alone, irrespective of any other question or consideration.

At the state election in November, 1879, the relator and respondent were both candidates for the office of lieutenant governor, for the term commencing January 1, 1880, having been put in nomination and supported as such by their respective parties.    The result of the official canvass, the correctness of which is admitted, showed that of all the votes cast for that office the respondent received a decided majority, and some 20,000 more than the relator, who was the next highest candidate.    Thereupon the respondent was duly declared elected, and given a certificate of election, and he subsequently qualified as such officer. ·

At the time of his nomination he was holding the office of a representative in the legislature from the first representative district in the county of Stearns, under an election for a term extending to January 1, 1881; but prior to the said state election he resigned that office, and his resignation was duly accepted.    In the convention that nominated him, the fact of his being a representative was made known, and the question of his eligibility to the office in view of it was discussed, with the result already stated.    The discussion was continued during the subsequent canvass, in the newspapers and at various public meetings held in different parts of the

state, his eligibility being insisted upon by his friends and supporters, and denied by his opponents. Upon this state of facts, relator claims that the respondent was ineligible to the office, under article 4, section 9, of the constitution, which provides that "no senator or representative shall, during the time for which he is elected, hold any office under the authority of the United States, or the state of Minnesota, except that of postmaster," and that the fact of his ineligibility was of such general notoriety as to be presumably within the knowledge of the whole body of electors, so that all votes cast for him must be treated as nullities, although not declared to be void by any express provision of law.

It may well be doubted whether the constitutional provision in question was intended as a restriction upon the choice of the electors in the selection of their official servants. Clauses of that character must receive a strict construction. They cannot be extended by implication. The constitution makes every qualified elector elegible to every office elective by the people, except as otherwise provided by some of its provisions, or by the constitution and laws of the United States. Article 7, § 7. In the case of justices of the supreme and district courts, special provision is made against their holding any other office under the United States or this state, and it also expressly provided that "all votes for either of them for any elective office under this constitution, except a judicial office, given by the legislature or the people, during their continuance in office, shall be void." Article 6, § 11. The clause under consideration contains no such declaratory enactment as to the effect of votes given to a senator or representative, while in office, for any other office. The prohibition is against holding any other office embraced within it, but it does not in terms go to the ineligibility of a person holding the office of senator or representative to an election to such other office. Ineligibility to hold an office, and ineligibility to an election to it, are not identical. One may be disqualified from holding an office at the time of his election

thereto, and yet be eligible to an election to it; and if, before he is required to enter upon its duties, the disability is removed, he may also take and hold it.

The plain purpose of the provision was to prevent persons holding official relations with any other department of government, state or federal, from influencing directly, by their presence and votes, legislative action in matters affecting such their relations, or their private or personal interests connected therewith. Hence the disqualification was attached *eo nomine* to a "senator or representative," which, of itself, clearly implies that it can only continue while the party affected by it remains a senator or representative. When he ceases to be such, whether by lapse of time, resignation, or otherwise, the disability terminates. The clause, "during the time for which he is elected," cannot properly be construed as enlarging the scope of the prohibition, so as to include persons not in fact members of the legislature. The expressed purpose of the provision was to prohibit senators and representatives from holding any other office than postmaster, and not to disqualify for a definite period of time persons who may become such, whether they remain in office or not. The clause may very properly be construed to mean "during his term of office," and this may be the full term during which the office may be held, or such shorter period as the incumbent may consent to hold it. The term of every elective office, in the absence of any express enactment of law to the contrary, may be terminated at the pleasure of the incumbent, by resignation, or by the acceptance of an incompatible office.

Conceding, however, the incorrectness of these views as to the construction of the constitutional provision in question, and that the respondent was in fact legally ineligible to the office of lieutenant governor, it is certain that his right to hold the office cannot be tested upon the information of the relator alone, without the consent of the attorney general, unless he shows himself entitled to the office by reason of

his having received the next highest number of votes to those cast for his ineligible competitor. The relator's right to the office depends upon the legal effect of the votes which the respondent received, assuming him to have been ineligible by reason of the alleged fact that his term of office as representative had not then expired, notwithstanding his resignation; the contention on the part of the relator being that they were absolute nullities, and therefore not to be counted or considered in determining the result of the election.

The authorities of both the English and American courts agree that the ineligibility of a candidate who has received the highest number of votes for an office will not, in the absence of any statute declaring them to be void, work the result of giving the election to the next highest candidate, when the voters for the former had no prior actual knowledge of the disqualifying fact, together with such other information as would raise a reasonable inference that they also knew that the fact amounted in law to a disqualification rendering the person voted for ineligible. *Queen* v. *Mayor, etc., of Tewkesbury,* Law Rep. 3 Q. B. 629, and cases cited *infra.*

In a well-considered case recently decided in New York, (*People* v. *Clute,* 50 N. Y. 451,) the rule which requires a vote to be treated as of no effect, in case the person receiving it is ineligible, is thus stated by the court, (page 466:) "The existence of the fact which disqualifies, and of the law which makes that fact operate to disqualify, must be brought home so closely and so clearly to the knowledge or notice of the elector as that to give his vote therewith indicates an intent to waste it. The knowledge must be such, or the notice brought so home, as to imply a wilfulness in acting when action is in opposition to the natural impulse to save the vote and make it effectual. He must act so in defiance of both the law and the fact, and so in opposition to his own better knowledge, that he has no right to complain of the loss of his franchise, the exercise of which he has wantonly misapplied." The case arose under a public statute, which

prohibited the election to an office of superintendent of the poor, in a county, of any supervisor of a town or ward in a city in such county, and the points decided were that Clute, who was a supervisor of a ward in the city of Schenectady, was ineligible to an election to the office of superintendent of the poor, and therefore not entitled thereto, though receiving the highest number of votes therefor, but that the electors of such ward were not chargeable, upon any presumptions of law or fact, with any notice or knowledge of the fact that he was such supervisor, or of the existence or operative effect of the public statute which made that fact a disqualifying one, so as to nullify the votes which were given to him in that ward, and thereby give the office to his competitor, who, but for such votes, received the requisite number to entitle him to an election. If the case at bar is to be decided upon the doctrine of that case, clearly the relator has no right to the office of lieutenant governor, though Mr. Gilman may have no legal right to hold it.

In *Gulick* v. *New*, 14 Ind. 93, subsequently followed by the same court in *Carson* v. *McPhetridge*, 15 Ind. 327, and *Price* v. *Baker*, 41 Ind. 572, while conceding the rule to be that ineligibility from a cause unknown to the voters, such as infancy or want of naturalization, will only operate to defeat the election of the person affected by it, it was held, in case the ineligibility arises out of holding a public office which is made a cause of disqualification by some public law, that the electors within the territorial limits of the jurisdiction of such officer are chargeable with notice as to who is the incumbent of the office, and also that the statute disqualifies him from being elected to any other, so that any votes cast by them in his favor therefor will be treated as nullities. The doctrine of these cases is disapproved in that of *People* v. *Clute*, above cited, and is undoubtedly against the general current of judicial opinion and authority in this country, which upholds, as more in harmony with the spirit of our institutions, the rule that a majority of votes cast for

an ineligible candidate at a popular election, in the absence of any statute declaring them void, while conferring no right to the office, are still so far effectual as to prevent a minority candidate being elected. *Com.* v. *Cluley,* 56 Pa. St. 270; *Saunders* v. *Haynes,* 13 Cal. 145; *Crawford* v. *Dunbar,* 52 Cal. 36; *State* v. *Giles,* 1 Chandler, (Wis.,) 112; (s. c. 2 Pinney, 166;) *State* v. *Smith,* 14 Wis. 497; *State* v. *Swearingen,* 12 Ga. 23; *People* v. *Molitor,* 23 Mich. 341; *State* v. *Gastinel,* 20 La. 114; *Fish* v. *Collens,* 21 La. 289; Opinion of Judges, 38 Me. 598; *Sublett* v. *Bedwell,* 47 Miss. 266; *In re Corliss,* 11 R. I. 638; Cooley on Const. Lim. 620; 1 Dillon, Mun. Corp. § 135.

In this state the question as yet is an open one, so that the point for adjudication upon the facts in the case at bar may and ought to be ruled upon reason and principle, having reference to our own laws and the policy they indicate. Our statute regulating elections (Gen. St. 1878, c. 1, § 48) enacts "that in all elections, unless it is otherwise expressly provided, the person having the highest number of votes for any office shall be deemed and declared to be elected." The plain purpose of this provision is to secure in places of public trust representatives of the popular will, chosen by a plurality of the qualified electors who may see fit to exercise the right of voting in the manner provided by law. Under it no one can be deemed the choice of the electoral body, or elected to any office, who has not received a plurality of the legal votes cast by that body. The statute prescribes the manner in which every elector shall exercise his right of voting, which shall be by a secret ballot, the form and character of which is prescribed. Gen. St. 1878, c. 1, § 14. It must be "a paper ticket containing, written or printed, or partly written and partly printed, the names of the persons for whom the elector intends to vote, and designating the office to which each person so named is intended by him to be chosen;" and every ballot having a greater number of names for any one office than the number of persons required to fill

the same, is declared to be void to that extent, but no further. Id. §§ 14 and 19.

For the purpose of determining the choice of the electors, no provision is made for any inquiry into their motives and intentions, or their means of knowledge concerning the qualifications of the persons voted for, other than what is furnished by the ballots themselves. That none such was intended to be allowed is evident from the nature and character of the secret ballot, which is guaranteed to every voter as an inviolable right by the constitution, for that precludes the possibility of identifying his vote, and prevents any effective investigation, outside the ballot itself, concerning the intention with which it was cast, or the knowledge which was had by the one who gave it. Every ballot, therefore, cast at any election, which substantially conforms to all the requirements of the statute, and which does not disclose upon its face any fact making it void, such as the ineligibility to an election of the person voted for, from which, possibly, a knowledge of that fact on the part of the voter might be inferred, and a presumption raised of an intention to waste his vote, must be taken as a valid and *bona-fide* expression of the voter's choice in favor of the person therein named for the office designated, and cannot be treated as a nullity. It cannot be presumed, in opposition to the declared purpose of the vote itself, that it was cast in bad faith, and with no intention to make it effectual, as might perhaps be the case with one voting with actual knowledge that the person voted for was in fact and in law ineligible to an election. To allow such a presumption to nullify more than half the votes given at a state election, as we are called upon to do in this case, would be doing violence to the fundamental principle of a popular government, which, in recognizing the fitness and capacity of the people for self-government, necessarily implies that the right of suffrage will be exercised in good faith, and in accordance with the best judgment and information of the electors.

Conceding, therefore, the respondent's ineligibility as claimed, it better accords with the policy of our election laws and the spirit of our political institutions to hold that those who voted for him acted from want of knowledge, or some misapprehension of law or fact affecting his eligibility, whereby the election has proved a failure, than to attribute to them such a wanton abuse of the elective franchise as would be implied in knowingly wasting their suffrages upon one disqualified from receiving them, and thereby give to the relator an election which is evidently not the result of the deliberate choice of the electoral body. As further bearing upon the question under consideration, it is to be noted that the framers of the constitution, in creating the disqualification mentioned in section 9 of article 4 of that instrument, made no provision for nullifying such votes as might be cast for a person resting under such disqualification; while in creating, in nearly identical language, a like disability in respect to justices of the supreme court and district judges, (article 6, § 11,) they expressly provided that "all votes for either of them for any elective office under this constitution, except a judicial office, given by the legislature or the people, during their continuance in office, shall be void." The implication is strong, if not conclusive, that the rule thus expressly adopted in the latter case was not intended to be applied in any case arising under the provisions of the former section.

It results from these views that the relator is in no position to question the legal right of respondent to hold the office of lieutenant governor, and his application must be denied.

GILFILLAN, C. J. I do not concur in what is said in the opinion of the majority of the court on the question of the respondent's eligibility to the office of lieutenant governor, and on the meaning of the constitutional provision referred to. I prefer to express no opinion thereon, as I do

not think it necessary to the decision of the case. I concur in the decision that the relator does not appear entitled to the office, and that therefore he cannot, without the consent of the attorney general, have the writ of *quo warranto* to test the respondent's right to the office.