6]                    AUGUST TERM, 1910.                    79

State ex rel. Bancroft v. Frear, 144 Wis. 79.

STATE EX REL. BANCROFT VS. FREAR, Secretary of State.

*October 10—December 6, 1910.*

*Primary elections: Death of candidate after ballots printed: Votes knowingly cast for decedent not to be counted: Knowledge when inferred: General election law, how far applicable to primaries: Filling vacancies.*

1. A dead man is not a "person" within the meaning of sec. 11—18, Stats. (Supp. 1906: Laws of 1903, ch. 451, sec. 18).

2. Votes which are in form cast for a deceased person by voters who know the fact of his decease cannot be considered as votes for or against any person, but must be regarded as so much blank paper.

3. During a campaign in which factional lines were closely drawn, five days before the primary election, and after the ballots therefor were printed, a candidate for the nomination for the office of attorney general came to his death by drowning. The fact of his death was published generally in the newspapers throughout the state, which further stated that if he received a plurality of votes at the primary the state central committee could fill the vacancy. Such statement was repeated in certain letters sent to many parts of the state and in numerous telegrams sent to supporters of one faction, calling upon them to urge voters to vote for the decedent notwithstanding his death. *Held*, that from these facts (admitted on demurrer) the court would infer that of the 63,482 votes cast for the decedent more than enough to give him the plurality of 5,286 which he received were cast by persons who knew that he was dead.

4. The provisions of the general election law contained in sec. 34, Stats. (1898), relating to the filling of vacancies caused by declination, death, or other disability of a nominated candidate, are not imported into the primary election law or made applicable to primary elections, although sec. 11—25, Stats. (Supp. 1906: Laws of 1903, ch. 451, sec. 25), declares that the provisions of the general election law in relation to the manner "of counting the ballots and making return thereof, and all other kindred subjects, shall apply to all primaries in so far as they are consistent with" the primary election law.

5. The death, before a primary, of one of several candidates for a party nomination at such primary does not create a "vacancy" which can be filled by the party committee either before or after such primary.

TIMLIN, SIEBECKER, and KERWIN, JJ., *dissenting*, are of the
opinion that under the provisions of sec. 34, Stats. (1898),.
made applicable to primary elections by sec. 11—25 (Supp.
1906), the votes cast for the deceased candidate for nomination.
under the circumstances above stated must be counted and re-
turned, and if they are greater in number than the votes cast
for any other candidate no nomination is made at such pri-
mary, but a vacancy exists which is to be filled by the party·
committee under sec. 11—13 (Supp. 1906).

THIS SUIT is brought originally in this court to compel the·
defendant to certify the name of the relator to the different
county clerks of the state as the candidate to be placed upon
the official ballot of the Republican party for the office of at-
torney general, to be voted for at the general election to be·
held in November, 1910. The complaint alleges that a pri-
mary election was held in Wisconsin on September 6, 1910;
that more than thirty days prior to the holding of such elec-·
tion, the relator and Frank T. Tucker and Henry A. Gunder-
son each duly filed in the office of the secretary of state his.
nomination papers as a candidate for the office of attorney·
general; that thereafter and within the time required by law
the secretary of state transmitted to each county clerk a list·
containing the name and postoffice address of each person
whose nomination papers had been filed in his office and was·
entitled to be voted for at the primary, together with the desig-
nation of the office for which he was a candidate and the party
or principle which he represented; that among the names so
transmitted were those of the relator and of said Tucker and
Gunderson; that thereafter and ten days before the holding
of the primary election the county clerks of the respective
counties caused the names so certified to be printed upon the
official ballot and distributed; that thereafter, on Septem-·
ber 1, 1910, said Frank T. Tucker died.

"That notwithstanding the death of said Frank T. Tucker,.
one C. H. Crownhart, a prominent supporter of one of the·
factions in the Republican party, of which faction said

Tucker, when in life, was a member, sent one hundred and sixty-nine different telegrams, addressed to one hundred and sixty-nine different prominent supporters of said faction in different parts of the state of Wisconsin, of which the following is a sample:

"'FRED E. OLEN,                Madison, Wis., 9—3—'10.
    " 'Florence, Wis.

  " 'Fine steam ahead. Few days more and La Follette will sweep state. Fight hard for legislature and state officers. We can win complete victory. Urge votes for Tucker. Committee can fill vacancy. Get evidence of any corruption for use later. Reports are fine. Telegraph this message to active workers every precinct.            C. H. CROWNHART.'

"That before the holding of said primary, and especially and particularly on September 2 and 3, 1910, it was generally stated and published in the different newspapers throughout the state that said Tucker was dead and that in case that he received the greatest number of votes at said primary, the Republican state central committee could fill the vacancy, and that such statements were, in substance, also recited in circular letters, which circular letters were addressed to many parts of the state, and a true and correct copy of said circular letters is in the words and figures following, to wit:

                 " 'PROGRESSIVE REPUBLICAN.
                 " 'La Crosse, Wis., Sept. 2nd, 1910.

  " 'Dear Sir: Every progressive certainly earnestly desires to see Progressive principles triumph in this campaign. To accomplish this Progressive men must be nominated to make our laws in nation and state and to enforce them as state officers.

  " 'Herewith will be found a sample ballot on which an X is printed after the names of candidates whom we believe to be thoroughly progressive. No attempt has been made to indicate a choice among the candidates for county offices, all of whom are well known in the county.

  " 'Frank T. Tucker, candidate for attorney general, is dead, apparently driven to his death by a political conspiracy against him. His name will be on the official ballot and every friend of good government should put an X after it. No true Progressive can vote for either of his opponents.

  " 'Let nothing keep you from the polls on Tuesday next.

Go without fail and see that your neighbor goes. You may be certain that every Tory voter will be out and that every influence which money can exert will be at work against Progressive candidates and principles.

" 'It is for *you* to decide which shall triumph, men or money.     PROGRESSIVE REPUBLICAN COMMITTEE.' "

That on September 26, 1910, the said canvassing board canvassed the returns certified to them, and that as to the office of attorney general said board certified that the whole number of votes cast for the office of attorney general was 168,925, of which the relator received 58,196, said Gunderson received 47,187, and said Tucker received 63,482, and that the scattering votes for such office amounted to 60; that it appeared from the returns that said Tucker received the greatest number of votes cast for the office; that it further appeared from an affidavit on file that said Tucker died on September 1, 1910, and that the death of said Tucker occurred after the ballots used at said primary were printed and after the time for filing nomination papers had expired. The canvassing board then certified that there was a vacancy in the nomination for the office of attorney general, to be filled as provided by law.

The complaint further sets forth that on the fourth Tuesday in September the candidates for the various state offices and for the senate and assembly, nominated by the Republican party at said primary, together with the senators of said party whose term of office extended beyond the first Monday in January, 1911, met and formulated the state platform of said party, and that the members of said platform convention passed a resolution indorsing and recommending C. H. Crownhart as the candidate for the office of attorney general to fill the alleged vacancy; that the state central committee of the Republican party at a meeting held on October 3, 1910, nominated said C. H. Crownhart as a candidate for the office of attorney general on the Republican

ticket to be voted for at the general election to be held on the first Tuesday in November, and certified said nomination to the secretary of state; that it is the duty of the said secretary of state to certify to the county clerks of the different counties of the state, not less than fourteen nor more than twenty days before the general election to be held in November, the name of each person nominated for any office; that said secretary of state claims that there was a vacancy in the candidacy for the office of attorney general and that it was within the power and was the duty of the state central committee to nominate some person to fill such vacancy; and that said secretary has given out that he will certify to the county clerks of the different counties of the state the name of C. H. Crownhart as the person to be placed upon the Republican ticket to be voted for at the general election.

The relief prayed for is that the secretary of state be enjoined from certifying to the several county clerks of the state the name of C. H. Crownhart, or any person other than the relator, as the candidate of the Republican party in Wisconsin for the office of attorney general, and that said secretary of state be commanded to certify the name of the relator as the candidate for said office.

To this complaint the defendant interposed a demurrer on the following grounds: (1) Because the court had no jurisdiction of the subject of the action; (2) because the plaintiff had not legal capacity to sue; (3) because it appears on the face of the complaint that it does not state facts sufficient to constitute a cause of action.

The cause was argued and submitted on October 10, 1910.

For the plaintiff there was a brief by *Olin & Butler,* and oral argument by *J. M. Olin.*

For the defendant there was a brief by the *Attorney General* and *Russell Jackson,* deputy attorney general, and *Walter D. Corrigan,* of counsel, and oral argument by *Mr. Jackson* and *Mr. Corrigan.*

On October 15, 1910, the following decision and dissent were filed:

PER CURIAM.    The following propositions are decided in this case:

(1) The provisions of the general election law contained in sec. 34, Stats. (1898), relating to the filling of vacancies caused by the declination, death, or other disability of a nominated candidate, are not imported into the primary election law and hence do not apply to primary elections.

(2) Under the allegations of the complaint it must be held that the fact of the death of Mr. Tucker was brought home to the knowledge of the great mass of the electors of the state before the holding of the primary, and that the great majority of the electors who placed a cross opposite his name upon the primary ballot did so with such knowledge.

(3) Votes which are in form cast for a deceased person by voters who know the fact of his decease cannot be considered as votes for or against any person, but must be regarded as so much blank paper.

(4) It follows that under the allegations of the complaint the relator received the greatest number of votes cast at the primary as a Republican candidate for the office of attorney general, and under subd. 1 of sec. 18 of the primary law is entitled to have his name placed upon the official ballot as such candidate.

Demurrer overruled, and judgment ordered for relator for relief by injunction as prayed in the complaint.

SIEBECKER, KERWIN, and TIMLIN, JJ. (dissenting).    We are of the opinion that sec. 34, Stats. (1898), pertaining to general elections is made applicable to primary elections. The legislature provided in the primary election law (sec. 25, ch. 451, Laws of 1903) that:

"The provisions of the statutes now in force in relation to the holding of elections, the solicitation of voters at the polls,

the challenging of voters, the manner of conducting elections, *of counting the ballots and making return thereof,* and all other kindred subjects, shall apply to all primaries in so far as they are consistent with this act, the intent of this act being to place the primary under the regulation and protection of the laws now in force as to elections." (Italics ours.)

This section in terms makes sec. 34, Stats. (1898), relating to general elections, applicable to primary elections, and therefore the following provision, in cases where a candidate for nomination on the official ballot at such election dies, governs this case:

"If the nominee die after the ballots are printed, and no nomination shall be made as herein provided, the votes cast for him shall be counted and returned, and if he shall receive a plurality the vacancy shall be filled as in case of vacancies occurring by death after election." Sec. 34, Stats. (1898).

Under these provisions the votes cast for Mr. Tucker are legal ballots and must be counted and returned, and when so counted and returned the result shows that neither of the other candidates for nomination for the office of attorney general of the state received as great a number of votes as were cast for him, hence the relator is not entitled to have his name placed on the official ballot as the nominee of his party.

The defendant moved for a rehearing and also moved that Supreme Court Rules 37–41, relating to motions for a rehearing, be suspended. The latter motion was denied October 25, 1910; and the motion for a rehearing was denied December 6, 1910.

The following opinions were filed December 6, 1910:

BARNES, J. The exigencies of this case called for a speedy decision thereof, so the mandate of the court was filed in advance of the time at which the decision would have been announced had the ordinary course been pursued. Before the opinion of the court was prepared, a motion for a rehearing was made, and thereafter, and within the time prescribed by

the rules of the court, a brief was filed in support of such motion. The delay in filing this opinion was due largely to the fact that such motion was pending and undetermined. Nothing was said in the brief filed on the motion for rehearing which changed the conviction of the court that its former judgment was correct. With these explanatory remarks by way of introduction, we proceed to state the reasons which impelled the court to reach the conclusion which it did.

The first and second grounds of demurrer were not urged upon this court. The action was brought by the relator after the attorney general refused to institute the same and after leave was granted by this court, and there is no want of capacity to sue on the part of the relator and no lack of jurisdiction in this court to hear and decide the cause on its merits.

The defendant contends (1) that at common law the votes cast for Mr. Tucker were not nullities, but should be counted, and that he having received a plurality of the votes cast, and being dead, there was a vacancy which should be filled in some lawful manner; and (2) that by virtue of sec. 25, ch. 451, Laws of 1903, being the primary election law, the provisions of sec. 34, Stats. (1898), pertaining to the conduct of general elections were incorporated into the primary law, and that under the terms of said sec. 34 the votes cast for Mr. Tucker should be counted, and a vacancy resulted if he received more votes than any other candidate.

1. Assuming that sec. 34, Stats. (1898), has no application to the case, we think there was no vacancy for two reasons: (a) Because of a provision in the primary election law itself, and (b) because under the common law votes knowingly cast for a dead man cannot be counted.

(a) Sec. 18 of the primary law provides:

"The person receiving the greatest number of votes at a primary as the candidate of a party for an office, shall be the candidate of that party for such office, and his name as such

candidate shall be placed on the official ballot at the following election." Sec. 11—18, Stats. (Supp. 1906: Laws of 1903, ch. 451, sec. 18).

We do not think that a dead man is a "person" within the meaning of this statute. The word "person" as it is ordinarily used means a living human being. It is so defined in Webster's and in Johnson's and in the Century dictionaries. It is so defined by the courts. *Sawyer v. Mackie,* 149 Mass. 269, 21 N. E. 307; *U. S. v. Crook,* 5 Dill. 453, 25 Fed. Cas. 695, 697; *Morton v. W. U. Tel. Co.* 130 N. C. 299, 41 S. E. 484; *Caldwell v. Wallace,* 4 Stew. & P. (Ala.) 282, 285; *Morrill v. Lovett,* 95 Me. 165, 169, 49 Atl. 666. In the latter case it is said: "The natural and obvious signification of the word 'person' in a statute is a living human being." Both the Maine and Massachusetts courts significantly say that when statutes refer to one who is dead they speak of him as a "deceased person" or a "person deceased."

It would seem ridiculous to place any other interpretation on the statute under consideration, because it expressly provides that the *person* receiving the greatest number of votes at the primary shall be the candidate, and that *his name shall be placed on the election ballot.* The legislature did not intend that if a dead man received a plurality of the votes cast he became the candidate of the party and that his name must go upon the ballot, to be voted for at the ensuing general election. If the word "person" as used in the statute means a living human being, then the relator satisfies the call of the statute in every particular. He is the *person* who received the greatest number of votes at the primary.

(b) It is well settled that where electors vote for an ineligible candidate without knowledge of his disqualification, and such candidate receives a plurality of the votes cast, his disqualification does not result in electing the candidate receiving the next highest number of votes. In such a case the votes cast for the ineligible candidate must be counted, and

there is a vacancy in the office instead of an election of the candidate receiving less than a plurality of the votes. *State ex rel. Dunning v. Giles,* 2 Pin. 166; *State ex rel. Off v. Smith,* 14 Wis. 497; *State ex rel. Holden v. Tierney,* 23 Wis. 430; 1 Dillon, Mun. Corp. (4th ed.) § 196; Cooley, Const. Lim. (7th ed.) 931; Naar, Suffrage & Elections, 163; *Barnum v. Gilman,* 27 Minn. 466, 8 N. W. 375; *Opinions of Judges,* 38 Me. 597; *People ex rel. Crawford v. Molitor,* 23 Mich. 341; *Saunders v. Haynes,* 13 Cal. 145; *People ex rel. Furman v. Clute,* 50 N. Y. 451; *State ex rel. Hardwick v. Swearingen,* 12 Ga. 23; *State ex rel. Goodell v. McGeary,* 69 Vt. 461, 38 Atl. 165, 44 L. R. A. 446; *In re Corliss,* 11 R. I. 638, 23 Am. Rep. 538, 544; *Comm. ex rel. McLaughlin v. Cluley,* 56 Pa. St. 270, 273; *Dryden v. Swinburne,* 20 W. Va. 89, 137.

The cases where the death of the candidate voted for took place before the polls closed on election day are not numerous. The courts that have passed upon the question hold that, where the electors cast their ballots for a dead man, in good faith and in ignorance of his death, the votes should be counted, and that if the decedent received a plurality of the votes cast there was no election. So held in *State ex rel. Sheets v. Speidel,* 62 Ohio St. 156, 56 N. E. 871, and in *Howes v. Perry,* 92 Ky. 260, 17 S. W. 575. In each of these cases the candidate died on election day before the polls closed, and there was no way in which it could be ascertained how many votes for him were cast before his death and how many afterwards.

There is a third class of cases in which the votes were cast for a candidate known to be dead or disqualified or for a fictitious person. The great current of authority is to the effect that such ballots are ineffectual for any person and cannot be counted in determining the result of the election. The English cases almost uniformly so hold. *King v. Hawkins,* 10 East, 211; *King v. Parry,* 14 East, 549; *Gosling v. Veley,*

7 Q. B. Rep. 406; *Trench v. Nolan,* 2 Moak's Notes, 711; *Reg. ex rel. Mackley v. Coaks,* 3 El. & Bl. 249; *Rex v. Monday,* 2 Cowp. 530; *Rex v. Foxcroft,* 2 Burr. 1017. Our own court, in *State ex rel. Holden v. Tierney,* 23 Wis. 430, 435, said that if the "person voted for had been a fictitious person, and this appeared on the face of the ballot, it might be said that the canvassers could reject it, and consider the ballot as being only for the real persons whose names were on it. This might have been done if one of the persons had been, as Lord CAMPBELL suggested in *Reg. ex rel. Mackley v. Coaks, supra,* 'the man in the moon.' " The foregoing excerpt cannot be regarded as passing upon the question even inferentially. The New York court holds that the "knowledge [*i. e.* of the disqualification] must be such, or the notice brought so home, as to imply a wilfulness in acting, when action is in opposition to the natural impulse to save the vote and make it effectual. He [the voter] must act so in defiance of both the law and the fact, and so in opposition to his own better knowledge, that he has no right to complain of the loss of his franchise, the exercise of which he has wantonly misapplied." *People ex rel. Furman v. Clute,* 50 N. Y. 451. Approved in *Barnum v. Gilman, supra,* and in *People ex rel. Sherwood v. State Board of Canvassers,* 129 N. Y. 361, 374, 29 N. E. 345.

It is held in Indiana that, where voters at an election either know as a matter of fact, or are bound to know in law, of the ineligibility of a candidate, the election does not result in failure, but the eligible candidate receiving the highest number of votes is legally elected. So it was decided that voters were chargeable with knowledge that the office of mayor was a judicial one, and that therefore under the constitution such officer during his term was not eligible to hold any office other than a judicial one. *Gulick v. New,* 14 Ind. 93, 77 Am. Dec. 49. It is said in this case that the main purpose of elections is to elect candidates to office, and that where

votes are knowingly cast in such a way that this end cannot be effected, the votes are powerless to prevent the election of any other person.    Other Indiana cases to the effect that votes cast for a candidate who is ineligible cannot be counted are *State ex rel. Morley v. Johnson,* 100 Ind. 489, and *Copeland v. State ex rel. Davis,* 126 Ind. 51, 25 N. E. 866.    These cases, however, have been modified by later decisions, and it is now held that, unless there is knowledge of the ineligibility on the part of the voter at the time he casts his ballot, the candidate receiving less than a plurality of the votes cast is not elected.    *State ex rel. Clawson v. Bell,* 169 Ind. 61, 82 N. E. 69; *Hoy v. State ex rel. Buchanan,* 168 Ind. 506, 81 N. E. 509; *State ex rel. Heston v. Ross,* 170 Ind. 704, 84 N. E. 150. The Maryland court at an early day decided that votes cast for an ineligible candidate were thrown away even though the voters were ignorant of the disqualification, and that the eligible candidate receiving the greatest number of votes was elected.    *Hatcheson v. Tilden,* 4 Harr. & McH. 278.

Cases intimating that votes cast with knowledge of the ineligibility of the candidate for whom they are cast should not be counted are *Comm. ex rel. McLaughlin v. Cluley,* 56 Pa. St. 270, 274; *Howes v. Perry,* 92 Ky. 260, 17 S. W. 575; *Gill v. Mayor, etc.* 18 R. I. 281, 27 Atl. 506; and *Saunders v. Haynes,* 13 Cal. 145.

The contrary rule was adopted by the St. Louis court of appeals in *State ex rel. Herget v. Walsh,* 7 Mo. App. 142, where it is held that votes cast for a candidate with knowledge of his death should be counted against the other candidates.    This case is approved in *Sheridan v. St. Louis,* 183 Mo. 25, 81 S. W. 1082, 2 Am. & Eng. Ann. Cas. 480, although there was no question of knowledge involved in that case.    As far as we can discover, the Missouri court stands alone on the question.

The great weight of authority, English and American, is to the effect that votes knowingly cast for a candidate who can-

not possibly exercise the functions of the office if elected, are thrown away, and it seems to us that this should be so.  Elections are held for the purpose of selecting officers, not for the purpose of creating a vacancy to the end that the place may be filled by appointment or even by a new election.  The function of the voter is to express an affirmative choice of some person; not to content himself with merely expressing his disapproval of certain candidates.  If a vote for a man known by the voter to be dead can be counted, then a vote for a stick or a stone or for "the man in the moon," as is said in the English cases, should be counted.  It is true that in this country the majority rules, but the majority should not pursue a policy of mere negation.  If the majority should contumaciously persist in voting for candidates notoriously ineligible, it might not be possible to fill the office at all.  The illustration may be somewhat far-fetched, but instances have occurred in England where an ineligible candidate for member of parliament received a majority of the votes cast at election after election, and such occurrences are by no means impossible in this country.  Besides, there can be no affirmative choice by the electors unless a new election is provided for and held.  Either the Republican state central committee or the governor must select the new candidate, if there is a vacancy in the instant case.  It may be that a single officer or a committee consisting of a couple of dozen members could make a selection that would be more acceptable to the majority in the present instance than would be the candidate for whom over 56,000 votes were cast, but conditions might easily change so that the contrary would be true.

It is argued that the court cannot assume that any considerable vote, or in fact any vote, was cast for Mr. Tucker by electors who knew of his death at the time they voted, and that therefore the rule as to votes cast for an ineligible candidate with knowledge of the fact of ineligibility does not apply.  The complaint does not aver actual knowledge of

Mr. Tucker's death on the part of a sufficient number of electors to give him a plurality of the votes cast. It sets up the facts from which knowledge is to be inferred, if inferred at all. The facts are admitted by the demurrer. It is only by proving such facts as are alleged that the relator could show knowledge at all, on the part of the electors, because it would be impossible to subpœna several thousand voters to testify as to how they voted and as to whether or not they knew of Mr. Tucker's death if they voted for him. Before such an inquiry could be concluded another primary election would have come and gone, and the delay and expense attendant on it would work a denial of justice. Mr. Tucker was a candidate for an important office in a more or less acrimonious campaign where factional lines were closely drawn. The complaint shows that the fact of his death was generally stated and published in newspapers throughout the state, as well as the fact that if he received the greatest number of votes at the primary the state central committee could fill the vacancy, and that such statements were repeated in circular letters addressed to many parts of the state, a sample copy of which will be found in the statement of facts. In addition to this 169 telegrams were sent out by a prominent supporter of one of the factions in the Republican party to 169 different prominent supporters of said faction, in different parts of the state, calling upon them to urge voters to vote for Tucker, and advising them that the committee could fill the vacancy. Thus, through the medium of the press and by means of telegrams and circular letters, the members of the faction in the party to which Tucker in his lifetime belonged were advised to vote for him notwithstanding his death. We think the court would be justified in assuming that a great majority of the electors of Wisconsin read one or more newspapers. Since the advent of rural free delivery the daily newspaper finds its way into the country districts with very little loss of

time in transmission.   News is disseminated rapidly.   With the newspapers publishing the fact of Mr. Tucker's death, and the well known tragic circumstances under which it occurred, and the members of the wing of the party with which he affiliated vigorously calling on its supporters to vote for him regardless of that fact, it may fairly be assumed that the electorate of Wisconsin was very generally informed of his death on election day.   Certainly we think a court should find on the admitted facts that enough votes were cast for Mr. Tucker by electors who knew he was dead when they cast them to give him a plurality over the relator; or, in other words, that at least 5,287 of the 63,482 persons who voted for him knew he was dead when they so voted.

2.   It remains to be determined whether what we find to be the common-law rule has been modified by statute.   The following provisions are the only ones which have any material bearing upon the subject:

Sec. 13 of the primary election law reads:

"Vacancies occurring after the holding of any primary shall be filled by the party committee of the city, district, county or state, as the case may be."   Sec. 11—13, Stats. (Supp. 1906: Laws of 1903, ch. 451, sec. 13).

Sec. 25 of the primary election law reads:

"The provisions of the statutes now in force in relation to the holding of elections, the solicitation of voters at the polls, the challenging of voters, the manner of conducting elections, of counting the ballots and making return thereof, and all other kindred subjects, shall apply to all primaries in so far as they are consistent with this act, the intent of this act being to place the primary under the regulation and protection of the laws now in force as to elections."   Sec. 11—25, Stats. (Supp. 1906: Laws of 1903, ch. 451, sec. 25).

Sec. 34, Stats. (1898), relates to holding general elections and provides that any person nominated for an office may decline in the manner therein prescribed.   The statute then

provides how a new candidate may be nominated in case of the death or declination of a nominee before the ballots are distributed.   The statute further provides:

"If such declination, death or the permanent removal of a nominee take place after the ballots are printed and before election, the proper chairman of the committee of the political organization of which such candidate was the nominee may make a nomination to fill the vacancy and provide the election boards with pasters containing the name of such nominee only, which shall be pasted upon each of the official ballots by the ballot clerks, before signing their initials thereon and delivering them to voters.   If the nominee die after the ballots are printed, and no nomination shall be made as herein provided, the votes cast for him shall be counted and returned, and if he shall receive a plurality the *vacancy* shall be filled as in case of vacancies occurring by death after election."

As will be observed, sec. 25 of the primary law makes the provisions of law in force when it was enacted, in relation to the holding of elections, the solicitation of voters at the polls, the challenging of voters, the manner of conducting elections, of counting ballots and making return thereof, and *all other kindred subjects,* applicable to all primaries in so far as they are consistent with the primary election law.   The section then recites that it is its intention to place the primary under the protection and regulation of the laws in force pertaining to elections.   It is argued that this provision incorporates sec. 34, Stats. (1898), into the primary law, and that, inasmuch as Mr. Tucker died after the ballots were printed, the votes cast for him should be counted and there is a vacancy by reason of his death, he having received a plurality of the votes cast.   There are a number of reasons why we think sec. 34 is no part of the primary election law.

We should have as little confusion as possible in our statute law.   Where the attempt is made to incorporate parts of a former law into one that is being presently made, the language used should be such as to indicate with a reasonable degree of

certainty what was in the legislative mind. A careful and intelligent reading of the two acts should be sufficient to indicate to the reader what parts of the old law were applicable to and were incorporated in the new. People are obliged to obey the laws, and in order that they may do so they should be put in a position where they can ascertain what they are. A study of the two sections convinces us that the legislature never intended that sec. 34 should have any application to a primary election.

In the first place the legislature made a special provision in the primary election statute (sec. 13) pertaining to the filling of vacancies. It is reasonable to suppose that when it undertook to specifically legislate on the subject of vacancies it did so fully. The legislature also had in mind the general provisions of the election law, because such law is referred to and its provisions are adopted so far as consistent with the primary law. The special provision found in the primary law in reference to the filling of vacancies is wholly redundant if it was intended to incorporate sec. 34 into the primary law. Sec. 34 deals specifically with matters arising after party nominations are made, and sec. 13 deals with matters arising after the primary election to nominate candidates is held. Sec. 34 of the general statute fully covers the subject that is covered by sec. 13 of the primary election law.

Again, sec. 34 relates in terms only to a person already nominated by a party, and it provides for the filling of a vacancy when one happens, by giving the party committee of that party power to fill it. This is logical, because the party committee is the executive arm of the party and very properly should represent it in such an emergency. But before the primary there is no party nominee. True, there may be several persons whose names have been properly put forward by nomination papers and who are thus entitled to have their names on the primary ballot, but these nominating signers have no executive committee recognized by law to act for

them.    It must frequently happen that these persons nomi-
nated before a primary represent factions in the party, and,
in all probability, one at least represents a faction whose ob-
ject it is to overthrow the faction which has control of the
party and is represented by the party committee.    Now, if
sec. 34 be imported into the primary law, the party commit-
tee, under its terms, would be authorized to fill a vacancy oc-
curring in the leadership of the party faction which was en-
deavoring to defeat and supplant the faction to which the com-
mittee belonged.    This seems absurd.    It is logical and sen-
sible to enact that the party committee shall act for the party
as a whole, because it represents the party.    It is neither logi-
cal nor sensible to enact that a party committee shall act for a
faction of the party or a mere group of party members, be-
cause it does not represent the faction or group.    Indeed, it
may be fighting such faction or group with all its power.

Another inherent difficulty in the way of holding that sec. 34
is a part of the primary law is the fact that we must supply
words therein and eliminate words therefrom in order to make
it applicable, which it is the function of the legislature to
eliminate or supply rather than of the courts.    The last sen-
tence of sec. 34 is the only one that can have any application
to the facts presently before us:

"If the nominee die after the ballots are printed, and no
nomination shall be made as herein provided, the votes cast
for him shall be counted and returned, and if he shall receive
a plurality the vacancy shall be filled as in case of vacancies
occurring by death after election."

The "nominee" referred to in sec. 34 is the person who has
received the party nomination for an office.    If the section is
part of the primary law we shall have to substitute for the
word "nominee" the words "candidate for the nomination."
The clause "and no nomination shall be made as herein pro-
vided," found in said sentence, can have no possible applica-
tion to a primary election.    The provision quoted recites that

State ex rel. Bancroft v. Frear, 144 Wis. 79.

the vacancy is to be filled as in case of vacancies occurring by death after election. It would be absurd to say that this part of the law could apply to primary elections, unless we interpolate words therein that wholly change its meaning. A vacancy in the office of attorney general occurring after election is filled by appointment by the governor. Now, the legislature could not have intended that the governor should fill a vacant place on a party ticket. That would enable him to name candidates for parties with which he was not affiliated and in whose success he had no interest and whose defeat he earnestly desired. This interpretation of the law would place him in a position where he might have the naming of a rival candidate if he were himself seeking a re-election. So we must either lop off this part of the sentence or supply words from some other statute so as to place the appointing power elsewhere. It should be just as permissible to amputate the first part of the sentence as it is the last, and if either can be eliminated we see no good reason why a combination of words found in the middle that make a complete sentence when standing alone may not be lifted out of sec. 34, or any part of the general election law for that matter, and be transported into the primary law. The possibilities of adding to the primary law in this way, as occasion arises, are boundless, but this method of lawmaking is too indefinite and uncertain to receive judicial sanction.

Again, sec. 34 provides for filling a *vacancy* caused by the death or declination or permanent removal of the party candidate. The death of Mr. Tucker created no vacancy. In the event of the death of a nominee of a political party there is a hiatus in the election ticket of the party nominating him, which very properly should be filled. The word "vacancy" conveys to the mind the idea of a place once filled but not so any longer. The primary election is held to enable the electors to select one of the few or many candidates who may invite the favorable consideration of the electors as a fit repre-

sentative of the party for some particular office.    To say that, if there are ten candidates of a party for one office, and one of them dies before the primary is held, there is a vacancy, seems illogical.    So long as there is presented to the electors one or more eligible candidates for their suffrage, how can it be said that there is any vacancy in the primary ballot?    The primary election presents a very different situation from the general election.    At the latter each party presents one, and only one, candidate for each office, and if he dies after nomination his place must be filled or the party can have no candidate.    The primary is a free-for-all, where any member of a party, by getting the requisite number of signers to his nomination papers, may do his best to convince his fellow party men that he is the logical candidate who should be selected by the party for a place on the election ballot.    But if death overtakes him before the primary is held, and there are other patriots who are not only willing but anxious to secure the prize, we fail to see where there is any vacancy.

Indeed, the defendant, in the brief filed on the motion for a rehearing, frankly makes concessions which coincide with the view above expressed.    His counsel say:

"It is perhaps true that a 'declination' or 'death' before the primary may or may not create a vacancy; for instance, where there are several candidates for the 'office of Republican nominee,' *the declination or death of one would perhaps create no such vacancy as is contemplated by this provision. The legislature had no such situation in mind as more than one candidate of a single party for an office.*    It had the general election in mind where there is but one party candidate. *It had in mind a vacancy occurring at or during a convention, or thereafter when there was an organized party committee.* Before the primary, it is possible there is no vacancy by the declination or death of one of several candidates.    There is no party committee representing a particular candidate among the several.    *Hence there is force to the argument that the vacancy which can be filled under this provision by party committee is one occurring or found to exist when the primary is over.*"

Counsel seek to avoid the apparent difficulty by proceeding to read or construe the troublesome provision as not being applicable to the primary law. Counsel have not favored us with their views as to how sec. 34 should be reconstructed so as to meet the case in hand. By generously carrying out the algebraic processes of elimination, by substitution and by addition and subtraction, it is possible to so remold sec. 34 as to make it fit this case; but we do not think the legislature intended that we should do so or that the citizen should be obliged to go through such a process to determine what the statute law of the state is. We fail to see how the word "vacancy" can be stricken from the statute, if it is to retain any life that would be helpful to the defendant, because it is only where a vacancy occurs that action can be taken by the party committee.

It may be said that sec. 13 of the primary law authorized the Republican state central committee to make a nomination under the facts before the court, although it was not seriously contended in the briefs of counsel or on the oral argument that such was the case. Unless a vacancy occurred after the primary was held, sec. 13 has no application. Mr. Tucker died and his supporters voted for him before the primary election was over. If the death of or the casting of votes for the deceased, or both, caused a vacancy, it did not occur "after the holding of any primary." If a vacancy occurred after the primary was held, it must have been because the votes were counted after the election. It is not apparent how the counting of votes can create a vacancy. If there was one, it was because the electors voted for a dead candidate. We have already given our reasons why the electors cannot create a vacancy by voting for a man known to be dead when the votes are cast.

TIMLIN, J. (*dissenting*). Frank T. Tucker, Henry A. Gunderson, and the relator were lawfully upon the official primary or nominating election ballot as candidates for the Re-

publican nomination for the office of attorney general. This primary election was held on September 6, 1910. After the official primary election ballots had been printed and on September 1, 1910, Mr. Tucker came to his death by drowning. No nomination was made to fill his place, but his name remained on the official primary election ballot. The fact of his death was widely known before the primary election, and, besides, a large number of telegrams and circular letters were sent out to the electors advising and urging them to vote for Tucker notwithstanding his death, and stating in effect that if a plurality of votes were so cast there would be created a vacancy which could be filled by the Republican state central committee. The state canvassing board on September 26, 1910, canvassed the vote of the primary election and found the votes for the several candidates for the Republican nomination for attorney general to be as follows: Levi H. Bancroft 58,196 votes, Henry A. Gunderson 47,187 votes, and Frank T. Tucker 63,482 votes; scattering, 60 votes. They further certified to the death of Tucker on September 1st after the ballots used at the primary were printed and after the time had elapsed for filing nomination papers, and that there existed, in consequence of the foregoing, a vacancy in the nomination for this office. On October 3d the Republican state central committee met and nominated C. H. Crownhart as a candidate for this office, and certified to the secretary of state his name as the candidate of the Republican party for the office in question at the ensuing election. The secretary of state now threatens and intends to certify to the several county clerks for a place on the official ballot the name of C. H. Crownhart as the Republican candidate for the office of attorney general. The figures certified concerning the vote for the several candidates are the true figures. The relator, on the other hand, contends that on the above showing there is no vacancy to be filled, that the votes cast for Mr. Tucker are void and cannot be counted, and that he is lawfully entitled

to be placed on the official election ballot as the candidate of said party for said office.

It has long been the law of this state that "the fact that the candidate who receives the highest number of votes is ineligible does not render the votes cast for him void, nor is the person receiving the next highest number, though eligible, to be regarded as legally elected or entitled to the office." *State ex rel. Dunning v. Giles,* 2 Pin. 166, 52 Am. Dec. 151, and cases in note. That case has been followed and approved by this court. *State ex rel. Off v. Smith,* 14 Wis. 497; *State ex rel. Holden v. Tierney,* 23 Wis. 430; *State ex rel. Guernsey v. Meilike,* 81 Wis. 574. This rule is in harmony with the great weight of authority elsewhere in this country. *Barnum v. Gilpin,* 27 Minn. 466, 8 N. W. 375, 38 Am. Rep. 304; *Howes v. Perry,* 92 Ky. 260, 17 S. W. 575, 36 Am. St. Rep. 591; *State ex rel. Goodell v. McGeary,* 69 Vt. 461, 38 Atl. 165, 44 L. R. A. 446; *Sheridan v. St. Louis,* 183 Mo. 25, 81 S. W. 1082; 10 Am. & Eng. Ency. of Law (2d ed.) 758. But it is contended by relator that death of a candidate cannot be considered as ineligibility within this rule. The contrary is, however, decided in *State ex rel. Herget v. Walsh,* 7 Mo. App. 142; *State ex rel. Sheets v. Speidel,* 62 Ohio St. 156, 56 N. E. 871; and *Howes v. Perry, supra,* and I have found no precedent for such distinction. Neither is such distinction supported by reason.

Whether in the absence of a statute the rule above quoted is inapplicable in a case where the voters, at and prior to the time of voting, knew of the ineligibility of the candidate receiving the greatest number of votes need not be decided, because we have in this state a statute covering the identical question. "If the nominee die after the ballots are printed, and no nomination shall be made as herein provided, the votes cast for him shall be counted and returned, and if he shall receive a plurality the vacancy shall be filled as in case of vacancies occurring by death after election." Sec. 34, Stats.

(1898). The "nomination to be made as herein provided" refers to the following provision: "If such . . . death . . . of a nominee take place after the ballots are printed and before election, the proper chairman of the committee . . . may make a nomination to fill the vacancy." Sec. 34, Id. These statutes last quoted were in force prior to and at the time of the adoption of the primary election law (ch. 451, Laws of 1903), hereinafter quoted, and are still in force. They related when adopted, and now relate, to the official general election ballot. Sec. 25, ch. 451, Laws of 1903, provides:

"The provisions of the statutes now in force in relation to the holding of elections, the solicitation of voters at the polls, the challenging of voters, the manner of conducting elections, *of counting the ballots and making return thereof,* and all other kindred subjects, shall apply to all primaries in so far as they are consistent with this act, the intent of this act being to place the primary under the regulation and protection of the laws now in force as to elections."

Ch. 451, Laws of 1903, consists of twenty-eight sections, and contains nothing inconsistent with the provisions of sec. 34, Stats. (1898), hereinbefore quoted, with reference to the counting of ballots for a deceased candidate and making return thereof. On the contrary, sec. 18 of ch. 451 expressly provides that "the person receiving the greatest number of votes at a primary as the candidate of a party for an office, shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the following election." It thus excludes the relator, because he did not receive the greatest number of votes, and it is only by treating votes which the statute law requires to be counted and returned as mere waste paper that the majority of the court arrived at the conclusion that the relator did receive the greatest number of votes.

This opinion might stop here, because it seems to me that

on the face of these statutes it is so clear that he who runs may read that the ballots cast for Tucker must be counted and returned. If by command of the statute they are counted and returned, that alone brings the case within the rule of *State ex rel. Dunning v. Giles,* 2 Pin. 166, 52 Am. Dec. 151. Ballots required by the statute to be counted and returned cannot be said to be mere waste paper. They still serve to show that the other candidates were not elected, and this is the reason the statute requires them to be counted and returned. A moment's reflection on the application of this sec. 34 to the general election law will disclose this purpose of the law. The purpose cannot be different when applied to the primary election. If it were not for this statute, in case the candidate of the majority party died under the circumstances mentioned the candidate of the minority party might be entitled to the office although he received only a minority of the votes cast. The statute does not go upon knowledge of the death on the part of the voter, and no such exception can be read into the statute. How my brethren fell into this error is easily seen. They found in this sec. 34 a provision that if the dead candidate, as shown by the count and return of the ballots cast for him, had received a plurality, the vacancy must be filled as in case of vacancies occurring by death after *election.* They first refused to consider the last word "election," taken with ch. 451, Laws of 1903, as quoted, equivalent to primary election, when the question before the court related to primary election. This is their first error, because they are by this statute last referred to required to apply to the primary election all the laws relating to the general election. The primary election law does contain provisions for filling a vacancy after the primary election. Sec. 13, ch. 451, Laws of 1903 (sec. 11—13, Stats.: Supp. 1906). "Vacancies occurring after the holding of any primary shall be filled by the party committee of the city, district, county or state, as the case may be." Having refused this interpretation, they were

still, in order to determine the case for relator, obliged to fur-
ther refuse to consider the provisions of sec. 34 for counting
and returning the vote separable from the provision for filling
the vacancy, notwithstanding the statute requires the applica-
tion to the primary election of all parts of sec. 34 not incon-
sistent with the primary election law.    Finding in other stat-
utes that the vacancy on an official general election ballot
caused by death must be filled after election by appointment
by the governor, they reject the whole of sec. 34 as applicable
to the primary election.    This is contrary to established law.
The form of statute which adopts and applies to a new sub-
ject matter the requirements of a pre-existing statute "so far
as consistent," "so far as applicable," "where applicable," "so
far as practicable," is very common.    Illustrations from
Wisconsin Statutes of 1898: Secs. 864, 874, 1150, 1151,
4651, and there are no doubt many others.    From Revised
Statutes of U. S.: Secs. 721, 914, 1891.    Whenever such stat-
utes come before the court, the provisions applicable or con-
sistent or practicable are never rejected merely because there
are found in the statute so adopted other provisions inappli-
cable, impracticable, or inconsistent.    The very form of the
adopting statute is sufficient to establish this proposition.
But the authorities are numerous.    26 Am. & Eng. Ency. of
Law (2d ed.) 714; *State ex rel. Spaulding v. Elwood,* 11
Wis. 17; *State ex rel. Saar v. Hundhausen,* 26 Wis. 432;
*Jenkins v. Morning,* 38 Wis. 197; *Chappell v. U. S.* 81 Fed.
764; *Nunes v. Wellisch,* 75 Ky. 363; *Lownsdale v. Portland,*
1 Oreg. 381; *Stark v. Starrs,* 6 Wall. 402.

Speaking of this subject in *In re Wood's Estate,* L. R. 31
Ch. Div. 607, it is said:

"Now what is the legal effect of the ninth section of the
act of 1855, which brings into that act those sections of the
former act?    It is to put them into the act of 1855, just as if
they had been written into it for the first time.    If a subse-
quent act brings into itself by reference some of the clauses

of a former act, the legal effect of that, as has often been held, is to write these sections into the new act just as if they had been actually written in it with the pen, or printed in it, and, the moment you have those clauses in the later act, you have no occasion to refer to the former act at all."

To the same effect is *Turney v. Wilton,* 36 Ill. 385, 393, where it is said:

"Whenever an act of the legislature confers powers which are recited in another act, the act to which reference is made is to be considered and treated as if it were incorporated into, and made a part of, the act which contains the reference."

In *Jones v. Dexter,* 8 Fla. 276, it was said:

"Where a statute has been enacted with special reference to a particular subject, and by another statute its provisions are directed in general terms to be applied to another subject of an essentially different nature, the adopting statute must be taken to mean that the provisions of the original statute shall be restrained and limited to such only as are applicable and appropriate to the new subject."

No liberality of construction need be invoked by defendant. By these statutes his contention is upheld *strictissimi juris.* The majority opinion might be compared in point of liberality of construction with that in *Neacy v. Milwaukee Co., post,* p. 210, filed on the same day. The relator has not received the greatest number of votes at the primary election, consequently placing him upon the official ballot as the candidate of the Republican party for the office in question is contrary to the command of the statute (sec. 18, ch. 451, Laws of 1903). The secretary of state was within his legal duty in certifying the name of Mr. Crownhart as the Republican candidate for this office.

I am instructed to say that Mr. Justice SIEBECKER and Mr. Justice KERWIN concur in this opinion.